**STATE of Iowa, Appellee,**

v.

**Edward Junior WATERBURY and Shirley May Joslyn, Appellants.**

**No. 64852.**

Supreme Court of Iowa.

June 17, 1981.

R. L. Sole and Robert E. Sosalla of Olinger, Sosalla & McManus, Cedar Rapids, for appellant Waterbury.

Mark H. Rettig of Hines, Pence, Day & Powers, Cedar Rapids, for appellant Joslyn.

Thomas J. Miller, Atty. Gen., Douglas F. Staskal and John Messina, Asst. Attys. Gen., and Susan Weller, Asst. Linn County Atty., for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, McGIVERIN, and LARSON, JJ.

REYNOLDSON, Chief Justice.

Defendants Edward Junior Waterbury and Shirley May Joslyn were charged jointly in a two-count trial information with first-degree murder, a violation of sections 707.1 and 707.2, The Code 1979, and conspiracy to commit murder, a violation of sections 706.1 and 706.3, The Code 1979. After the jury returned verdicts of guilty as to all charges, the court entered judgment convicting each defendant of murder and sentencing each to life imprisonment. Each defendant timely appealed. We affirm the conviction of defendant Waterbury, but reverse and remand for new trial as to defendant Joslyn.

Defendants were brother and sister. They were accused of murdering Joslyn's husband, Robert "Wayne" Joslyn, on July 19, 1979. At about 12:57 a. m. on that day, Cedar Rapids police responded to a call from Joslyn and went to the Joslyn apartment. They found Robert's body in the bedroom. It was later determined that he had died from massive bleeding caused by fourteen gunshot wounds. The State obtained a confession from Waterbury that he and Joslyn decided Robert should be killed because of his repeated beatings of Joslyn. He bought a six-shot revolver from Brenda Culp, a former wife, with $200 given him by Joslyn for that purpose. He purchased ammunition and on the evening of July 18 went to his sister's apartment, where he went to sleep on a couch. Later when he heard Robert snoring, he went into the bedroom and fired at him, reloaded, and fired again until he was sure he was dead.

The weapon was found in Waterbury's car. The State presented evidence it was the gun purchased from Culp and that it and ammunition Waterbury purchased on July 18 were used in the homicide.

Culp testified that when she sold the gun to Waterbury on July 17 he called someone on her telephone and said, "I thought that I would call you and let you know that I have not taken off with your money. I did get it, and I'll bring it over to you . . . ." Culp testified she put the gun in a paper sack, folded it in the smallest size it could be folded, and gave it to Waterbury. Barbara Cones, Joslyn's neighbor, testified she saw Waterbury deliver a paper grocery bag to Joslyn at the latter's residence on July 18. When Waterbury saw Cones was watching he stated, "Here's my laundry." Cones thought this was "kind of funny" because the sack was rolled up and did not appear large enough to contain laundry.

On July 18, the morning before the killing, Joslyn twice called her sister Velma. The latter testified that on both occasions Joslyn reported that "she got a phone call and that some guy threatened to come out . . . and kill her husband, and he was going to come out and do it in the next few days. He was going to kill the S.O.B."

After the police arrived at the apartment, one officer drove Joslyn to the police station. There she eventually gave three different written statements, the last of which admitted her brother had threatened to kill Robert, and did kill him, the first shots occurring in her presence. Later while being booked, according to the police, she orally admitted giving Waterbury "$200 to buy the gun."

Other evidence will be referred to as required by the following issues the defendants raise.

I. *Motion to sever trial of codefendants.*

Joslyn filed a timely motion for severance of defendants pursuant to Iowa Rule of Criminal Procedure 10(2)(e), which was overruled. Because we must reverse as to her on other grounds, we are not required to determine whether she was prejudiced by this ruling. *See State v. Gibb,* 303 N.W.2d 673, 677 (Iowa 1981); *State v. Belieu,* 288 N.W.2d 895, 900 (Iowa 1980).

▮ Nor is a reversal required as to Waterbury on this ground. He did not move for separate trial or join Joslyn's motion. He filed a pretrial "Motion for Bifurcated Proceedings" that he now argues should somehow be construed as a motion to sever. Fairly construed, however, the motion merely requested the court to require a prima facie case of conspiracy before any codefendants' statements were introduced. This motion was sustained by the trial court.

II. *Application of Bruton rule.*

In pretrial motions, during trial, and in posttrial motions, defendants unsuccessfully asserted the rule in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The *Bruton* Court held the admission of a codefendant who did not take the stand deprived the defendant of his rights under the sixth amendment confrontation clause, when that confession implicated the defendant. Even when (as here) the jury is instructed to consider the confession only against the declarant, the court determined that the danger of misuse of the confession by the jury was too great to be constitutionally admissible. *Id.* at 136–37, 88 S.Ct. at 1628, 20 L.Ed.2d at 485.

▮ The *Bruton* holding subsequently has been limited by the Supreme Court. Thus, even where a codefendant's extrajudicial confession is admitted erroneously, it may constitute harmless error if there is other overwhelming evidence of defendant's guilt, so that the prejudicial impact of the codefendant's statement was relatively insignificant. *See Brown v. United States,* 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 215 (1973); *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340, 344 (1972); *Harrington v. California,* 395 U.S. 250, 253–54, 89 S.Ct. 1726, 1728–29, 23 L.Ed.2d 284, 287–88 (1969).

In a recent plurality decision representing the views of three Justices, *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), the Supreme Court sought to resolve a conflict among the circuit courts as to whether the *Bruton* rule applied in a situation of "interlocking confessions," where a codefendant's confession implicates a defendant who also has confessed. The plurality opinion held there was no infringement of the right to confrontation:

> The prejudicial impact of a codefendant's confession upon an incriminated defendant who has, insofar as the jury is concerned, maintained his innocence from the beginning is simply too great in such cases to be cured by a limiting instruction. The same cannot be said, however, when the defendant's own confession . . . is properly introduced at trial. . . . [T]he incriminating statements of a codefendant will seldom, if ever, be of the "devastating" character referred to in *Bruton* when the incriminated defendant has admitted his own guilt.

*Id.* at 72–73, 99 S.Ct. at 2139, 60 L.Ed. 2d at 723. Justice Blackmun, concurring in part, thought the Court should not adopt a rigid *per se* interlocking confession rule. He expressed a preference for the harmless error analysis, although conceding that if the confessions did not interlock to a

sufficient degree the Court would have to make a harmless error determination anyway. *Id.* at 79, 99 S.Ct. at 2142, 60 L.Ed.2d at 727 (Blackmun, J., concurring in part). Justice Stevens, joined by Justices Brennan and Marshall, dissenting, apparently would apply neither exception to the *Bruton* rule. *Id.* at 81–91, 99 S.Ct. at 2143–49, 60 L.Ed.2d at 728–34 (Stevens, J., dissenting). Justice Powell did not participate in the decision.

■ In the case before us, trial court referred to *Parker* in ruling on defendants' pretrial motions, apparently convinced interlocking confessions were involved. We cannot agree. We find Joslyn was prejudiced impermissibly when Waterbury's confession was introduced and she had no opportunity to cross-examine him because he did not take the stand.

Regardless of the pretrial appearance of the situation, the course of trial clearly disclosed this was no *Parker* situation. The first two written statements Joslyn gave did not implicate either defendant. In the third she related Waterbury's part in the killing, but accepted no responsibility. Only her later alleged oral statement to the police, that she gave her brother $200 to buy the gun, could be regarded as directly implicating her in any activity occurring before the homicide. She took the stand and denied making this statement. Waterbury's confession stated he and Joslyn had "decided that [Robert] should be killed," and that she gave him $200 to purchase the gun.

The record discloses Waterbury's counsel on opening statement told the jury his client was not denying he shot the victim. But Waterbury did not take the witness stand. Joslyn had no opportunity to cross-examine him. Waterbury told the person preparing his presentence report that Joslyn "knew nothing of the shooting prior to its occurrence."

As to Joslyn this is a classic *Bruton* situation. Nor can it be said the evidence against her was so overwhelming that admission of Waterbury's confession in the joint trial was harmless error. We already have noted that her limited alleged admis-

sion, which she denied, does not present us with a case of "interlocking confessions" that would require us to consider application of the *Parker* exception.

On the other hand, we find no merit in Waterbury's efforts to invoke *Bruton*. He cross-examined Joslyn, and brought out substantially the same details of his own involvement that were contained in her third statement to the police and in his own written confession. He had, and exercised, the right of confrontation.

On this issue we reverse and remand for new trial as to Joslyn only. We discuss other alleged errors she asserts only to the extent they may recur.

III. *Admission of Joslyn's statements to police.*

By motion to suppress, renewed at trial, Joslyn challenged the admissibility of written statements and the alleged oral statement she made at the police station.

The evidence shows Joslyn was not a suspect when she was taken to the police station as a matter of convenience and routine. Her first written statement, given about 4 a. m., was identical to the oral statement she made at the apartment and asserted an unknown assailant did the shooting. After talking to other persons, including Joslyn's sister Velma, the detective returned in about an hour and orally advised Joslyn of her constitutional rights. She also signed a written form setting out and acknowledging her rights under *Miranda*. She then gave and signed another statement at about 6 a. m. in which she identified the assailant as a lover, one Ronald Walters. After a fruitless forty-five minute attempt to locate such a person, the police questioned Joslyn again, and at about 7 a. m. she gave and signed a statement in which she said Waterbury had shot her husband. Joslyn's oral statement about furnishing the $200 for the gun allegedly was made while being booked for murder at about 8:40 a. m.

■ On the record made in this trial we find the State has carried its burden to show her statements were made voluntari-

ly. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966). There was no in-custody questioning before 5:30 a. m. on July 19. After that the interrogation was interrupted. There is no indication she was subjected to influences that overbore her will or rendered her capacity for decision making "critically impaired." *State v. Munro,* 295 N.W.2d 437, 440 (Iowa 1980); *State v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975).

### IV. *Admission of Joslyn's statements as against Waterbury.*

Waterbury interposed numerous hearsay objections to Joslyn's statements to the police. Ultimately the first two written statements were admitted against Waterbury, but the jury was instructed not to consider the third statement and the subsequent oral statement against him.

 The State argues the first two statements were not hearsay as to Waterbury, because they were not offered as proof of the matters asserted therein. We agree. These statements were not offered to prove the fictitious persons described actually committed the murder. Rather, they were offered to prove Joslyn had made the statements, and made them as a part of the concealment phase of the conspiracy. *See State v. Kern,* 307 N.W.2d 22, 25 (Iowa 1981); *State v. Baker,* 293 N.W.2d 568, 574–75 (Iowa 1980).

Even assuming the statements were hearsay they nevertheless were admissible, as trial court ruled, under the coconspirator's exception to the hearsay rule. *See Kern,* 307 N.W.2d ᐧ at 27. The coconspirator's exception has been described as follows:

Any act or declaration by one co-conspirator committed *in furtherance of the conspiracy and during its pendency* is admissible against each and every co-conspirator provided that a foundation for its reception is laid by independent proof of the conspiracy.

*State v. Blyth,* 226 N.W.2d 250, 269 (Iowa 1975) (emphasis supplied).

A conspiracy may continue into the concealment phase. *State v. Kidd,* 239

N.W.2d 860, 864 (Iowa 1976). Here the prosecution made a strong showing that Joslyn and Waterbury engaged in a conspiracy to kill Robert Joslyn that included agreed steps to conceal the conspiracy after its primary goal was achieved. First, there was the evidence of Joslyn's phone call to her sister Velma on the day before the killing, in which she "set up" the story she told the police after the murder. Second, Waterbury audaciously called the apartment after the murder. His confession included this statement:

After I left the apartment I went to the E Avenue Tavern and had some rum and coke and called Shirley's apartment at about 1:00 a. m. A police officer answered the phone but then he put Shirley on the phone and I talked to her. She told me over the phone that someone had just shot Wayne [Robert] and I asked her if she wanted me to come over and she said yes, please. We later went down to the police station where they were investigating this situation but Shirley and I never let on as though I had been involved.

Joslyn's challenged statements clearly were admissible proof of the concealment segment of the conspiracy.

### V. *Admission of testimony of Brenda Culp.*

 The minute of Brenda Culp's testimony attached to the trial information stated she would testify the murder weapon was stolen in May 1975. Defendants made appropriate objections to her trial testimony relating to Waterbury's purchase of the gun on July 17. An in-chambers discussion ensued. The State conceded the trial information did not set out a "full and fair statement of the witness' expected testimony" as required by Iowa Rule of Criminal Procedure 5(3). But defense counsel agreed they were not surprised, because this testimony was disclosed fully when defendants took Culp's deposition on October 4, 1979.

In *State v. Walker,* 281 N.W.2d 612, 614 (Iowa 1979), we observed rule 5(3) was enacted to provide the accused with information "sufficient—fully and fairly—to alert

defendant generally to the source and nature of the evidence against him." We reinforced the rule in *State v. Olsen*, 293 N.W.2d 216, 220–21 (Iowa), *cert. denied,* —— U.S. ——, 101 S.Ct. 530, 66 L.Ed.2d 290 (1980), by reversing for the prosecution's failure to comply with it. But in this case defendants were thoroughly apprised of the evidence to be presented by this witness's testimony two months before trial. The elements of surprise or prejudice were nonexistent. Thus we hold there was no reversible error in permitting the testimony to be introduced despite the faulty minute in the trial information. *See State v. Smith*, 282 N.W.2d 138, 141 (Iowa 1979). Our ruling should not be interpreted as imposing any burden on an accused to take discovery depositions to avoid a claim of waiver of error relating to an incorrect or insufficient minute of testimony.

VI. *"Confused" rulings on evidence.*

Waterbury also argues that trial rulings on admissibility of evidence were "so confused and convoluted as to be virtually unintelligible," so that the jury was "unable to render a fair and impartial verdict."

Most of the difficulty resulted from trial court's policy of overruling certain hearsay objections to statements allegedly made by Joslyn, "subject to being connected up," that is, subject to an independent showing of a conspiracy that would allow the admission of the statements under the coconspirator's exception.

The problem was compounded because even though the court had sustained Waterbury's "Motion for Bifurcated Proceedings" some witnesses had to be taken out of order when jury selection took far longer than anticipated. In any event, the conditional rulings ultimately were resolved against Waterbury and the evidence was held admissible against him after the court determined there was sufficient independent proof of the conspiracy. Thus if the jury ultimately was unclear that certain statements were admissible as to Waterbury, he could not have been prejudiced. We find no reversible error here.

VII. *Sufficiency of evidence as to Waterbury.*

Waterbury contends there was insufficient evidence to support his conviction. On review, we consider the evidence in the light most favorable to the State. *State v. Gibb*, 303 N.W.2d 673, 685 (Iowa 1981).

We first note Waterbury's detailed confession was unchallenged and came in without objection. It was corroborated by Joslyn's testimony and by the testimony of Brenda Culp, from whom he purchased the gun. There was further evidence the gun was the murder weapon, he had purchased the ammunition for it, and the gun and the remaining shells were found in his possession.

We have considered other contentions advanced by Waterbury and find them to be without substance.

VIII. *Validity of Joslyn's sentence under section 706.4, The Code 1979.*

Joslyn appears to argue she was improperly sentenced under section 706.4, The Code 1979. Because she must be retried on the same charges, we address the question we were not required to answer in *State v. Moritz*, 293 N.W.2d 235, 242–43 (Iowa 1980).

Section 706.4 provides:

A conspiracy to commit a public offense is an offense separate and distinct from any public offense which might be committed pursuant to such conspiracy. *A person may not be convicted and sentenced for both the conspiracy and for the public offense.*

(Emphasis supplied.) The jury found Joslyn guilty of both conspiracy to commit murder and murder. We cannot determine whether she asserts she should have been sentenced only for conspiracy, or not at all.

Trial court submitted both counts to the jury, proceeding on the theory one commentator has articulated:

Because the statutory language says that a person "may not be *convicted* and *sentenced* for both [offenses]," both offenses may still be *prosecuted* by including them in multiple counts of the indict-

ment [or] trial information. Under Iowa law, a person is not convicted until entry of judgment by the court. Accordingly, it appears that the trier of fact could be given verdict forms as to both offenses, with the prosecution then being required to elect before entry of judgment which conviction it wants recorded.

Dunahoo, *The New Iowa Criminal Code*, 29 Drake L.Rev. 237, 344 (1980).

■ An alternative interpretation of section 706.4 that we find more logical avoids the necessity to make any choice. This is to view the last sentence as merely creating a merger of the conspiracy and the substantive offense where the defendant has been found guilty of both offenses. Thus the defendant should be sentenced solely on the substantive offense.

Conspiracy has been treated as a separate offense for two principal reasons: first, the potential for more effectiveness in group activity aimed at a criminal purpose is a greater threat to society; and second, the criminal law ought to intervene against those disposed to commit crime before their plans reach fruition. W. LaFave and A. Scott, Jr., *Handbook on Criminal Law* § 61, at 459 (1972).

Of course this rationale is less compelling after the goal of the conspiracy has been realized. Early intervention has lost its purpose. The logical focus then is not on punishing the conspiracy agreement, but on punishing the accomplishment of the agreed purpose.

Thus we hold Joslyn was sentenced properly under section 706.4, but we set the judgment aside and reverse for new trial for the reasons stated in division II. One-half the costs are taxed to the State and one-half to Waterbury.

AFFIRMED AS TO WATERBURY; REVERSED AND REMANDED AS TO JOSLYN.