THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MITCHELL LINK *et al.*, Defendants-Appellants.

Second District    No. 80-500

Opinion filed October 2, 1981.—Rehearing denied November 13, 1981.

Lance Haddix, of Chicago, for appellants.

Fred Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and William Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Mitchell Link and Karen Link, his wife, were jointly tried and convicted of murder in a jury trial. They were each sentenced to 35-45 years in prison. They appeal, contending that they were not proved guilty beyond a reasonable doubt and, alternatively, that various trial errors deprived them of a fair trial.

The defendants were charged with the murder of Kenneth Glabe, Karen Link's then husband, on June 29, 1971. The principal witness for the State was Preston Haig. He testified that Mitchell Link hired him to murder Kenneth Glabe and that Karen Link participated in the murder plot against her then husband. Haig pleaded guilty to the murder under a plea-bargaining agreement with the State and, prior to the beginning of this trial, was sentenced to 14-28 years imprisonment. His truthful testimony at the Links' trial was part of the agreement.

Haig testified that he had become acquainted with Mitchell Link while Link was working at a drug store which Haig visited as a member of the Arlington Heights police department. Haig resigned from the police department in May of 1971 under threat of internal investigation and began experiencing financial difficulties. In early June he said he had a conversation with Mitchell Link and said that the latter recounted his relationship with Karen Glabe and that Kenneth Glabe would not give her a divorce. Haig testified that Mitchell asked if he knew a "hit" man and, after reflection, Haig agreed to kill Kenneth Glabe for $5,000. They planned for the murder to occur on a stretch of Route 173 in a remote part of Zion. Karen was to go to dinner with Kenneth at the Lake-Air Restaurant in Zion. On the way home she would pretend to be sick and ask Kenneth to let her out of the car; would run up a designated path where Haig was waiting in ambush; and Haig would stab Kenneth many times to make it look like a frenzied murder by a "junkie." He also planned to leave a syringe and some Preludin at the scene.

Haig testified that on June 29, 1971, he parked his parents' car at a bowling alley and walked to the ambush site. After waiting an hour he

heard a car stop and saw a woman pass by followed by a man. He jumped out and stabbed the man in the back. Thereafter he stabbed the body repeatedly and dragged it behind a bush where he had been hiding. He then hit Karen on the back of the neck as planned and told her to lie down and pretend that she was unconscious. He drove the Glabe vehicle to the bowling alley, left it there, and then drove away in his parents' car. He said he then called Mitchell Link at the pharmacy and told him that it was done and he then drove around and disposed of the weapon, some of his clothing, and threw away the balance of the clothing into a dumpster near his apartment. Haig eventually ended up in Roswell, New Mexico, and lived there with his new wife Deanna under the name of Scott Savage. In April 1979, Deanna told the police about Haig's involvement in the murder and he was arrested, waived extradition and was taken to Lake County.

In his testimony Haig also related that about a week before the murder he told his then girl-friend, Jeanine Pelletiere, that he was going to murder for money, that it involved a love triangle situation and that it would take place in a remote area. He said that a day or two after the murder Pelletiere showed him a newspaper clipping about the Glabe murder, asked him if he was the one that had done it, and that he confirmed that he had. He said that when she asked who hired him he gave her a false name, "Phil." He did not recall if he had asked her for help at this time. He said that his memory was "clouded" about this particular period. After this he had several conversations with Mitchell Link. When he later learned that the police were looking for a man named "Phil" he realized that Pelletiere had talked to the police, and he decided then to leave the State. He called Mitchell and told him of his intentions and said that Mitchell told him he would be paid later. Jeanine Pelletiere testified over defendants' objection and corroborated that Haig had made the before and after murder statements to her. Jeanine Pelletiere also testified that possibly two days after the murder in her conversation with Haig, Haig told her he was worried about his call to the Northgate Pharmacy to confirm the killing and that it might be traced. She said that Preston Haig told her that she was to say that she made the call about going out to dinner; and that Preston also wanted her to say that he was at the place where the witness was working on the night of the murder.

Ann DeMillo testified that at about 10:30 p.m. on June 29, 1971, she was driving on Route 173 and saw what she thought was a child lying on the side of the road. She stopped, as did another motorist, and the person, identified later as Karen Link, began scooting away saying "get away from me." The police were called and Karen related that she and her husband were driving home after dinner, that she felt sick, asked her

husband to stop and went to the. weeds to "heave" when someone grabbed her and knocked her out. DeMillo testified that Karen went from calmness to hysteria while relating the story.

A number of police officers who responded to the call or participated in the investigation testified as to their observations at the scene and their investigation of the murder. A number of neighbors testified to seeing Mitchell Link at the Glabe residence frequently shortly after the murder. There was testimony that Karen Link showed a lack of mourning over her husband's death. Several witnesses also testified as to the amounts of money which Karen Link received as the result of her husband's death from his life insurance policy, the Veterans Administration, and social security. There was also testimony that Karen took an overdose of sleeping pills on August 6, 1971, the day she was served with a grand jury subpoena.

Deanna Savage, the wife of Preston Haig testified, over an objection that had been made at an *in limine* hearing. She said that in the period between October 9, 1971, and October 16, 1971, she had a conversation with Preston Haig in her apartment in Long Beach, California, in which he asked if she would make a phone call for him. She said she then went to San Pedro, which is some 9 or 10 miles from Long Beach, to a public phone booth where she again had a conversation with Haig. She related that Haig told her he was going to dial the number and that he needed her to ask for "Mitch" because he was afraid that his voice would be recognized; and that they might answer as a pharmacy. He dialed a long distance number, handed her the phone, she asked to speak to Mitch and a voice answered "I am Mitch." She said she then handed the phone back to Haig and returned to her car; that when Haig rejoined her he told her he had been indicted by the grand jury and asked her if he could have money wired to him in her name to which she agreed. Over objection the witness was not allowed to go into a further conversation with Haig later that evening, pursuant to an *in limine* ruling that she could only testify as to the money. The witness testified that Haig had advised her that $1,000 would be wired to the Western Union in Long Beach. When she arrived there she received a check with "Mitch's" name on it in the amount of $600, which she gave to Haig, receiving $200.

Both defendants testified and denied planning the murder. They both admitted that they had an adulterous relationship in 1970 and that Karen had asked Kenneth for a divorce and that he had refused. Mitchell admitted sending $600 to Preston Haig, but claimed it was repayment for a loan he had gotten from Haig.

The record fully supports our conclusion that defendants were proved guilty beyond a reasonable doubt. The testimony of Preston Haig clearly proves a conspiracy between the defendants and himself to

accomplish the murder of Kenneth Glabe. Essentially, defendants argue that the testimony of Haig as a claimed accomplice is unworthy of belief because of inconsistencies, contradictions and because of the benefit he was getting from his plea bargain.

■■ From the whole record, the inconsistencies appear trivial in comparison with the many points upon which Haig's testimony has been corroborated by the testimony of other witnesses and by many circumstances. The plea bargain under which Haig had already been sentenced which was conditioned only on his truthful testimony at this trial does not, on the record before us, show a sufficient reason to view the testimony of the accomplice as unworthy of belief; and the jury has resolved the issue of credibility by its verdict.

The most serious of defendants' claims of prejudicial trial error involve the admission of the extrajudicial statements attributed to Preston Haig by Jeanine Pelletiere. The first statement made before the murder, was Haig's relating to Pelletiere that he had taken a contract to kill a man together with other details of the plan. The second, made possibly two days after the murder, was Haig's admission that he committed the murder and was hired by a man named "Phil," as well as his request that Pelletiere provide him with an alibi.

The defendants argue that their constitutional rights to confront witnesses and to cross-examine witnesses who testify against them was violated when Pelletiere was permitted to testify to statements allegedly made by Preston Haig but which he did not remember making. They argue that this unfairly bolstered the credibility of Haig who could not be cross-examined on the issue because of his lack of recall. The State maintains that the statements are admissible as declarations of a co-conspirator explaining a common plan or conspiracy as an exception to the hearsay rule. The State also argues that since on cross-examination defense counsel asked Haig whether he had denied any conspiracy shortly after his arrest in New Mexico, the premurder statement is admissible to rebut the inference of recent fabrication.

■■ We do not agree with that portion of the State's position which is to the effect that the declaration of co-conspirators to be admissible must merely explain the common plan or conspiracy. We conclude that such declarations must be in furtherance of the conspiracy to be admissible.

Declarations of one conspirator made during the pendency of a conspiracy may be used against both conspirators on the theory that the declarant is the agent of his co-conspirators but "only when made in furtherance of the conspiracy". *People v. Davis* (1970), 46 Ill. 2d 554, 558; *People v. Goodman* (1980), 81 Ill. 2d 278, 284-85. See also *People v. Thomas* (1976), 38 Ill. App. 3d 689, 692 and Annot., 46 A.L.R.3d 1148, 1155 (1972).

■■ We cannot support the testimony of Pelletiere as to Haig's declaration of his plan to commit the murder in conspiracy with others, made prior to the murder. We fail to see, and the State has not indicated, how the premurder statements to one who was not a co-conspirator can be termed in furtherance of the conspiracy.

■■ However, in our view, the premurder statements were properly admissible under the second theory suggested by the State, to rebut the inference of recent fabrication created by the defense on cross-examination of Haig. While the defendant argues that the questions asked did not suggest that Haig's testimony was of recent fabrication, we believe that that is a fair characterization of the questioning. The implication of asking Haig whether he denied any conspiracy shortly after his arrest in New Mexico fairly suggests an inference that Haig was fabricating his testimony implicating the Links some time after his denial. *People v. Clark* (1972), 52 Ill. 2d 374, 389. See McCormick, Evidence §49, at 106 (2d ed. 1972).

■■ We also conclude that the statements made after the crime were for the purposes of concealment and were admissible. Using the name "Phil" as that of the co-conspirator Mitchell Link was an effort at concealment. Similarly the attempt to create an alibi was to conceal Haig's involvement in the conspiracy as well as Link's. "[A] conspiracy includes subsequent efforts at concealment, * * * if those efforts are proximate in time to the commission of the principal crime." In *People v. Meagher* (1979), 70 Ill. App. 3d 597, 603, a declaration made the morning following the crime was held to be proximate in time to the commission of the underlying offense. (See also *People v. McInnis* (1980), 88 Ill. App. 3d 555, 565-66.) Here, Haig's statement to Pelletiere was within two days of the commission of the crime and was directed at concealing his involvement. We therefore conclude that it was properly admissible since it was close enough to the commission of the offense as not to be subject to serious doubts as to trustworthiness. (See *People v. Meagher*, at 603.) Although there was a long interval between the making of the declaration and the testimony of the witness, the circumstances would suggest that the matter was one which the witness would very likely have remembered.

While the defendants have sought to place the testimony of Deanna Savage (Haig) in the same category as the declarations testified to by Pelletiere, the record does not support this position. The witness was permitted only to testify to what she did with reference to the transfer of money from Mitchell Link to Haig. Mitchell Link in his testimony did not deny sending the $600, but sought to explain the transaction at variance with the testimony of Haig.

■■ Defendants also argue that colored slides of the deceased as shown to the jury over objection were inflammatory and aroused their passion and

prejudice. However, the slides have not been made a part of the record on appeal and the alleged error was not raised in a post-trial motion. By failing to raise the alleged errors in a post-trial motion, defendants have waived these issues for purposes of appellate review except on a theory of plain error. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 181-82.) We cannot determine the inflammatory nature of the slides as they are not in the record. The trial court specifically ruled that the slides were not so gruesome as to be inflammatory. In this posture, we deem the error, if any, waived. Moreover recent cases have upheld the introduction of even gruesome colored photos of a deceased on the theory that they were relevant to a fact in issue. (*People v. Foster* (1979), 76 Ill. 2d 365, 377; *People v. Campbell* (1979), 77 Ill. App. 3d 804, 817.) Here the slides were relevant to corroborate Haig's testimony as to the manner in which the wounds were inflicted.

We will comment briefly on the remaining claims of error which we do not find persuasive as grounds for reversal.

■■ Defendants objected at trial to the giving of an instruction that the State was not required to prove a motive for the commission of the crime (IPI Criminal No. 3.04) since, as the record shows, motive was argued to the jury. We agree that it is error to give the instruction when the State produces evidence of motive or argues motive to the jury (*People v. Manzella* (1973), 56 Ill. 2d 187, 199; *People v. McClure* (1979), 80 Ill. App. 3d 10, 17.) However, in both of these cited cases and all others cited by the defendants the reviewing court has found the error to be harmless under the particular circumstances. We also conclude that on this record the error did not deny the defendants real justice or influence the jury's verdict (*People v. Manzella*, at 200) and was therefore harmless beyond a reasonable doubt.

■■ We also conclude that the court did not err in refusing to allow defendants to impeach the State's witness Deanna Savage (Haig) by her conviction of a felony in 1968 from which she was released from prison in 1969, more than 10 years prior to her testimony. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 516.) And, the issue was waived as it was not raised in the post-trial motion. Even if we were to consider it under the rule of plain error, defendants' position that the *Montgomery* 10-year rule only applies to defendants and not other witnesses is untenable. See *People v. Warmack* (1980), 83 Ill. 2d 112, 124.

■■ Defendants argue that testimony by State witnesses concerning their adulterous relationship was irrelevant and prejudiced them by informing the jury of their bad moral character. The defendants did not object at trial to this testimony and therefore have waived the issue. In any event, the evidence was obviously relevant to prove motive and did not constitute the kind of irrelevant bad character condemned in the cases cited

by defendants. See, *e.g., People v. Butler* (1974), 58 Ill. 2d 45, 50; *People v. Bailey* (1979), 77 Ill. App. 3d 953, 957.

■■ Finally, we find no basis for defendants' claim that the prosecutor's closing argument contained reversible error. The first argument complained of is an improper assertion of the prosecutor's personal belief, but it is in no way egregious or inflammatory. The second argument, asserted to be a misstatement of evidence, appears to accurately recount the evidence as we review the record. Defendants did not object at trial to either of the comments nor raise them in the post-trial motion, and in no sense do we find that they rise to the level of plain error.

The judgments are therefore affirmed.

Affirmed.

REINHARD and HOPF, JJ., concur.