533 A.2d 271

**STATE of Maryland**

v.

**Billy Clayton RIVENBARK.**

**No. 55, Sept. Term, 1986.**

Court of Appeals of Maryland.

Nov. 20, 1987.

Valerie V. Cloutier, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on the brief), Baltimore, for appellant.

Howard L. Cardin, Assigned Public Defender (Mark L. Gitomer, Assigned Public Defender, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, COUCH *, and McAULIFFE, JJ. and MARVIN H. SMITH, Associate Judge of the Court of Appeals (retired), specially assigned.

ELDRIDGE, Judge.

Under a well-established exception to the hearsay rule, a co-conspirator's statements made while the conspiracy is in effect and in furtherance of its aims are admissible against fellow conspirators. *Lawrence v. State,* 103 Md. 17, 20, 63 A. 96, 97–98 (1906); *Bloomer v. State,* 48 Md. 521, 531 (1878). The principal question in the present case concerns whether, after the conspirators have attained their central

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

objectives, there is an implied subsidiary conspiracy of concealment during which one co-conspirator can continue to bind his confederates with hearsay declarations.

The pertinent facts are as follows. Early on the morning of May 24, 1981, Katherine Buress was beaten to death after intruders bound her hands and feet with shoestrings. Mrs. Buress, a widow, lived alone and was known to possess many large diamonds. For several months, the murder remained unsolved. Then, in September 1981, Shirley Wilson informed the police that Ronald Johnson, her boyfriend and Mrs. Buress's nephew, had committed the murder. Later, the authorities began to suspect that Johnson had acted in concert with the defendant, Billy Rivenbark.

According to Wilson's trial testimony, on several occasions in May 1981, Johnson and Rivenbark discussed Mrs. Buress's diamonds as well as the possibility of robbing a drug dealer's house. On May 23, 1981, the day before his aunt was murdered, Johnson had demanded that Wilson find him a ski cap, scissors, and a pair of gloves. Johnson used the scissors to cut holes in the ski cap.

At about midnight on the night of May 23rd, Rivenbark roused Johnson, and the two left together. Johnson returned at about 4:00 a.m. After some questioning, he told Wilson that something had gone wrong, that someone had gotten hurt, but that he had his alibi.

Throughout the night and during much of the next day, Johnson periodically dialed a telephone number, listened, and then hung up. At about 4:00 p.m., he indicated to Wilson that the police had found Mrs. Buress's body. He then explained that he and Rivenbark had intended to burglarize Mrs. Buress's house, but that their plan had gone awry. Mrs. Buress had discovered them. Then, to coerce her into revealing the location of her diamonds, Rivenbark had brandished a .22 caliber pistol and ordered Johnson to hit her. Johnson refused and argued with Rivenbark, thus revealing his identity to his aunt.

Also on the day after the murder, Wilson met with Rivenbark, who told her: "We got our alibis.... As long as everyone stays cool everything will be fine." Rivenbark suggested that he and Johnson should not see each other for a while and instructed Wilson to tell Johnson "to make sure the stuff was gone." After receiving this message, Johnson brought a brown bag from his car. Wilson discovered that the bag contained a pair of shoestrings, the ski cap with holes cut out, and a pair of bloody gloves—the same pair that she had given to Johnson the day before. Johnson ordered Wilson to place the bag in a white, plastic bag, which was taken out with the next morning's trash.

In the months following, Johnson continually beat Wilson to prevent her from disclosing her knowledge of the crime. Because of these beatings, Wilson left Johnson in September 1981, filed assault charges against him, and disclosed to the police his role in Mrs. Buress's death. The police did not immediately arrest Johnson, so he was not aware that he had become a murder suspect. In November 1981, the police persuaded Wilson to meet with Johnson while wearing a bodywire. The purpose of the meeting ostensibly was to discuss the assault charges pending against Johnson; however, Wilson managed to elicit from Johnson numerous statements in which he inculpated both himself and Rivenbark in Mrs. Buress's murder. Shortly after the meeting, Rivenbark and Johnson were charged in the Circuit court for Baltimore County with murder and related offenses.

The State introduced Johnson's November 1981 statements at the separate trials of Johnson and Rivenbark. Johnson was convicted, and the Court of Special Appeals affirmed. *Johnson v. State,* No. 858, September Term 1982 (filed February 3, 1983), *cert. denied,* 298 Md. 48, 468 A.2d 1013 (1983). Rivenbark was convicted of first degree murder and burglary, but the Court of Special Appeals reversed and remanded for a new trial, holding that the trial court erred in refusing to instruct the jury on the law of accomplices. *Rivenbark v. State,* 58 Md.App. 626, 636–637, 473 A.2d 1329, 1334 (1984).

At Rivenbark's second trial, the State again introduced Johnson's recorded statements made to Wilson in November 1981. The jury again found Rivenbark guilty of first degree murder and burglary.[1] Rivenbark was sentenced to imprisonment for life on the murder conviction and twenty years concurrent on the burglary conviction. The Court of Special Appeals again reversed the murder conviction, but it affirmed the burglary conviction. The intermediate appellate court held that Johnson's statements were erroneously admitted against Rivenbark. The court rejected the State's arguments that, as a matter of law, every conspiracy contains an implied, subsidiary conspiracy of silence, and that Johnson's recorded statements were made during the pendency of such an implied conspiracy. *Rivenbark v. State*, 66 Md.App. 378, 388–389, 504 A.2d 647, 652 (1986). The appellate court seemed willing to accept the proposition that, after attainment of the conspiracy's central objectives, certain concerted acts of concealment might yield an "actual" conspiracy of silence; however, the court concluded that in this case any such conspiracy had ended long before Johnson made the challenged statements. 66 Md.App. at 389, 504 A.2d at 652–653.

The Court of Special Appeals also held that Rivenbark had effectively appealed only his murder conviction. The appellate court, therefore, affirmed Rivenbark's burglary conviction. 66 Md.App. at 390, 504 A.2d at 653.

Both the State and Rivenbark filed petitions for writs of certiorari. We granted both petitions.

## I.

This Court has never considered whether every criminal conspiracy includes, by implication, a subsidiary conspiracy to conceal evidence of the substantive offense that the

---

1. Specifically, the jury found Rivenbark guilty of felony murder, but not guilty of premeditated murder and second degree murder.

conspirators agreed to commit.[2] Relying on decisions from other jurisdictions, the Court of Special Appeals rejected this theory. In reaching its decision, however, the court recognized that some courts had reached a contrary result.

The leading case in support of the Court of Special Appeals' conclusion is *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). In *Krulewitch,* the Supreme Court held that a co-conspirator's statement is inadmissible unless it was made before the attainment of the conspiracy's central objective or "main aim." 336 U.S. at 443–444, 69 S.Ct. at 718–719, 93 L.Ed. at 794–795. Underlying this decision was a concern that a contrary ruling would lead to an intolerable expansion of the co-conspirator exception. Krulewitch had been charged with a Mann Act violation and with conspiracy to violate the Mann Act. One and one-half months after he had allegedly transported the complaining witness from New York to Florida—indeed, after the witness had returned to New York—she met with Krulewitch's co-conspirator. The co-conspirator urged the witness not to talk with government agents until she had consulted a lawyer, and to "[b]e very careful" about what she said. In addition, the co-conspirator stated: " 'It would be better for us two girls to take the blame than [Krulewitch] because he couldn't stand it....' " *Id.* at 441, 60 S.Ct. at 717, 93 L.Ed. at 793. Writing for the Court, Justice Black rejected the Government's argument that, even after conspirators have attained their central objectives, an implicit, subsidiary phase always survives, with concealment

---

2. On a number of occasions, however, the Court of Special Appeals has addressed similar questions. *Compare Thomas v. State,* 63 Md. App. 337, 347–348, 492 A.2d 939, 944–945 (1985), and *Irvin v. State,* 23 Md.App. 457, 473, 328 A.2d 329, 338, (1974) *aff'd,* 276 Md. 168, 344 A.2d 418 (1975) (statements made after conspirators achieve "main aim" do not fall within co-conspirator's exception), *with Myers v. State,* 58 Md.App. 211, 240, 472 A.2d 1027, 1042, *cert. denied,* 300 Md. 484, 479 A.2d 373 (1984) (statements made after offense for purpose of concealment fall within co-conspirator's exception); *Johnson v. State,* 9 Md.App. 327, 341, 264 A.2d 280, 289, *cert. denied,* 258 Md. 728 (1970) (conspiracy can carry over into acts performed to conceal crime).

as its sole objective. Such a rule, Justice Black observed, would automatically create a further breach of the general rule against the admission of hearsay evidence. "For," he continued, "plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators." 336 U.S. at 444, 69 S.Ct. at 719, 93 L.Ed. at 794–795.

Justice Jackson, in an often cited concurring opinion in *Krulewitch,* found it "difficult to see any logical limit to the 'implied conspiracy,' either as to duration or means." 336 U.S. at 456, 69 S.Ct. at 724, 93 L.Ed. at 800. He explained: "Conspirators, long after the contemplated offense is complete, after perhaps they have fallen out and become enemies, may still incriminate each other by deliberately harmful, but unsworn declarations, or unintentionally by casual conversation out of court." *Ibid.* And, he added, "If the law implies an agreement to cooperate in defeating prosecution, it must imply that [the agreement] lasts as long as prosecution is a possibility, and prosecution is a possibility as long as the conspiracy to defeat it is implied to continue." *Ibid.*

For several decades, the Supreme Court has adhered to the rule and rationale of *Krulewitch.* *See, e.g., Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Rule 801(d)(2)(E) of the Federal Rules of Evidence, which embodies the co-conspirator exception to the hearsay rule, is consistent with *Krulewitch.* *See* Fed.R.Evid. 801(d)(2)(E) advisory committee's note. Additionally, a significant number of state courts have elected to follow *Krulewitch* and to reject the theory of an implied, subsidiary conspiracy of concealment. *See, e.g., State v. Yslas,* 139 Ariz. 60, 63–64, 676 P.2d 1118, 1121–1122 (1984); *Smith v. State,* 6 Ark. App. 228, 232, 640 S.W.2d 805, 808 (1982); *People v. Saling,* 7 Cal.3d 844, 853–854, 500 P.2d 610, 616, 103 Cal.Rptr. 698, 704 (1972); *Napier v. Commonwealth,* 515 S.W.2d 615, 616

(Ky. 1974); *State v. Patriarca,* 112 R.I. 14, 40–41, 308 A.2d 300, 316 (1973). *See also State v. Tilley,* 292 N.C. 132, 141, 232 S.E.2d 433, 440 (1977) ("absent special allegation and proof, the courts will not allow into evidence statements that were made after the attainment of the criminal project on the theory that there existed a secondary and continuing conspiracy to conceal the fact of the first crime"); *State v. Davis,* 19 Or.App. 446, 450, 528 P.2d 117, 119 (1974) (holding admissible statements made in connection with affirmative acts of concealment only if such acts directly relate to the disposition of the fruits or the concealment of the traces of the crime, and only if the conspirators initially contemplated performing such acts).

On the other hand, some courts have admitted co-conspirator's statements made after the conspirators had achieved their main aim but in connection with an attempt to conceal evidence of the substantive offense. *See, e.g., Carter v. State,* 106 Ga. 372, 376–377, 32 S.E. 345, 347 (1899); *State v. Waterbury,* 307 N.W.2d 45, 50 (Iowa 1981); *State v. Emory,* 116 Kan. 381, 384, 226 P. 754, 756 (1924); *Commonwealth v. Stuart,* 207 Mass. 563, 567, 93 N.E. 825, 826 (1911); *People v. Mol,* 137 Mich. 692, 707, 100 N.W. 913, 918 (1904); *State v. Strait,* 279 S.W. 109, 114 (Mo.1925); *State v. Arnold,* 84 Mont. 348, 361–362, 275 P. 757, 760 (1929); *Crew v. State,* 100 Nev. 38, 46, 675 P.2d 986, 991 (1984); *State v. DeRighter,* 145 Ohio St. 552, 558–559, 62 N.E.2d 332, 335–336 (1945); *State v. Crabtree,* 655 S.W.2d 173, 178 (Tenn.Crim.App.1983). *See also* 2 *Wharton's Criminal Evidence,* § 430 (12th ed. 1955); 3 *Underhill's Criminal Evidence,* § 864 (5th ed. 1957). *Cf. People v. Meagher,* 70 Ill.App.3d 597, 603–604, 26 Ill.Dec. 800, 804, 388 N.E.2d 801, 805 (1979) ("a conspiracy includes subsequent efforts at concealment, but only if those efforts are proximate in time to the commission of the principal crime").

The cases adopting the theory of an implied subsidiary conspiracy to conceal, however, fail to recognize that, in virtually every case, conspirators will attempt to conceal their offense. As Justice Jackson pointed out in *Krule-*

*witch*, these attempts at concealment will continue as long as prosecution is a possibility, and prosecution is a possibility as long as the attempts at concealment continue. Thus, under these decisions, virtually every conspiracy will include a subsidiary conspiracy of concealment of uncertain, if not unlimited, duration. Yet even these courts seldom hold that such an implied conspiracy has extended more than a few weeks after the commission of the substantive offense.[3] In this case, however, the co-conspirator made his challenged statements almost six months after the commission of the substantive offense.[4]

---

**3.** The decisions often do not reveal the amount of time that has passed between the commission of the substantive offense and the co-conspirator's statement. The following cases, however, indicate the amounts of time that the courts have found tolerable. *People v. Columbo,* 118 Ill.App.3d 882, 74 Ill.Dec. 304, 455 N.E.2d 733 (1983), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2394, 81 L.Ed.2d 351 (1984) (morning after); *People v. Link,* 100 Ill.App.3d 1000, 56 Ill.Dec. 394, 427 N.E.2d 589 (1981), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2297, 73 L.Ed.2d 1301 (1982) (two days); *People v. McInnis,* 88 Ill.App.3d 555, 44 Ill.Dec. 120, 411 N.E.2d 26 (1980) (half hour); *People v. Meagher,* 70 Ill.App.3d 597, 26 Ill.Dec. 800, 388 N.E.2d 801 (1979) (following day); *State v. Waterbury,* 307 N.W.2d 45 (Iowa 1981) (within six hours); *State v. Roberts,* 95 Kan. 280, 147 P. 828 (1915) (evening of crime, day after crime, and during days and weeks immediately after crime); *Commonwealth v. Stuart,* 207 Mass. 563, 93 N.E. 825 (1911) (shortly after defendants fraudulently induced victim to sell property, but while victim still possessed property); *State v. Ronimous,* 319 S.W.2d 565 (Mo.1959) (same day); *State v. Priesmeyer,* 327 Mo. 335, 37 S.W.2d 425 (1931) (fourteen days); *State v. Strait,* 279 S.W. 109 (Mo.1925) (less than three weeks); *State v. Arnold,* 84 Mont. 348, 275 P. 757 (1929) (three months); *State v. Shelton,* 51 Ohio St.2d 68, 364 N.E.2d 1152 (1977), *vacated,* 438 U.S. 909, 98 S.Ct. 3133, 57 L.Ed.2d 1153 (1978) (approximately one hour); *State v. Gauthier,* 113 Ore. 297, 231 P. 141 (1924) (several days); *State v. Crabtree,* 655 S.W.2d 173 (Tenn. Crim.App.1983) (approximately one month).

**4.** We are aware of only one case in which a court held that a conspiracy of concealment had lasted more than six months. In *Evans v. State,* 222 Ga. 392, 150 S.E.2d 240, *cert. denied,* 385 U.S. 953, 87 S.Ct. 336, 17 L.Ed.2d 231 (1966), *overruled on other grounds, Harris v. State,* 255 Ga. 464, 339 S.E.2d 712 (1986), the Georgia Supreme Court held that a conspiracy's concealment phase lasted more than one year after the commission of the substantive offense. 222 Ga. at 402, 150 S.E.2d at 248. One commentator has described the *Evans*

Moreover, as pointed out by the Court of Special Appeals in this case (66 Md.App. at 388, 504 A.2d at 652), many decisions that appear to endorse the theory of an implied ongoing conspiracy of concealment actually hold only that a conspiracy endures through acts of concealment performed *before* the conspirators finally achieve their main purpose. For example, burglars and robbers must hide while dividing the proceeds of their crime; thieves must misrepresent their title in order to dispose of stolen property, and arsonists must convince insurers that property damage was accidental rather than intentional. Several courts hold that statements made in connection with such acts are admissible simply on the ground that the statements were made before the conspirators had attained their chief aim. *See, e.g., Scott v. State*, 30 Ala. 503, 509 (1857); *Hooper v. State*, 187 Ark. 88, 92, 58 S.W.2d 434, 435 (1933); *People v. Saling, supra*, 7 Cal.3d at 852, 500 P.2d at 615, 103 Cal.Rptr. at 703; *Hicks v. State*, 213 Ind. 277, 287–288, 11 N.E.2d 171, 175 (1937), *cert. denied*, 304 U.S. 564, 58 S.Ct. 951, 82 L.Ed. 1531 (1938); *State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976); *Allen v. Commonwealth*, 176 Ky. 475, 485–486, 196 S.W. 160, 165 (1917); *Osborne v. State*, 99 Miss. 410, 422–423, 55 So. 52, 53–54 (1911); *Foss v. State*, 92 Nev. 163, 167, 547 P.2d 688, 691 (1976); *Gelosi v. State*, 215 Wis. 649, 655–657, 255 N.W. 893, 895–896 (1934). *See also State v. Lucas*, 372 N.W.2d 731, 738 (Minn.1985).

Courts that endorse the theory of an implied conspiracy of concealment seldom explain their reasoning. In particular, these courts fail to consider the possibility of placing their decisions on the narrower ground that the conspirators had not achieved their principal aim when the challenged statements were made. Nor do they respond to the criticisms set forth by the Supreme Court in *Krvlewitch, supra*.

---

case as "extraordinary." *McCormick on Evidence*, § 267, at 794 n. 47 (E. Cleary ed. 1984).

■ We therefore agree with the Court of Special Appeals that the better reasoned cases reject the theory that every criminal conspiracy includes, by implication, a subsidiary conspiracy to conceal evidence of the substantive offense that the conspirators agreed to commit. Consequently, we adopt the *Krulewitch* view that a co-conspirator's statement is inadmissible unless it was made before the attainment of the conspiracy's central objective.

■ This is not to say that statements made in connection with acts of concealment are never admissible. As noted above, conspirators do not necessarily achieve their chief aim at the precise moment when every element of a substantive offense has occurred. Before the conspirators can be said to have successfully attained their main object, they often must take additional steps, *e.g.*, fleeing, or disposing of the fruits and instrumentalities of crime. Such acts further the conspiracy by assisting the conspirators in realizing the benefits from the offense which they agreed to commit. *See Osborne v. State, supra,* 99 Miss. at 423, 55 So. at 54. Therefore, statements made in connection with such acts occur before the conspirators have attained their chief objective and are admissible. *See Grunewald v. United States, supra,* 353 U.S. at 405, 77 S.Ct. at 974, 1 L.Ed.2d at 943–944. On the other hand, it is necessary to distinguish statements made in connection with acts of concealment performed long after the conspirators have realized all benefits from the offense which they had agreed to commit. Such statements occur after the conspirators attained their principal aim and are, therefore, ordinarily inadmissible. *Ibid.*

■ In addition, if the conspirators expressly agree at the outset to engage in concerted acts of concealment after committing a substantive offense, then statements made in connection with those acts are admissible. *See Grunewald,* 353 U.S. at 404, 77 S.Ct. at 973–974, 1 L.Ed.2d at 943. In such a case, the conspirators' principal aim is not simply the successful completion of the substantive offense. Rather,

by virtue of the actual agreement, their principal aim includes the acts of concealment as well.

■ Applying these considerations to the facts of this case, it is apparent that, long before Johnson made the recorded statements to Wilson, Johnson and Rivenbark had attained the principal aim of their conspiracy—a burglary. The conspirators' chief objective may not have been achieved until they disposed of the instrumentalities of the crime on May 25, 1981, when garbagemen collected a plastic bag containing the shoestrings, ski cap, and bloody gloves. Nevertheless it clearly had been achieved by November 1981, when the statements were made.

■ The State also argues that Johnson and Rivenbark expressly conspired to conceal their offenses. In support of this contention, the State emphasizes the following facts which occurred in May 1981: Rivenbark's suggestion to Wilson that he and Johnson should not see one another for a while; Rivenbark's statement to Wilson that "We got our alibis"; Rivenbark's instruction to Johnson, communicated through Wilson, to "make sure the stuff was gone"; Johnson's destruction of the shoestrings, the ski cap, and the bloody gloves; and Johnson's continued beatings of Wilson.

These facts are not sufficient to establish an express conspiracy of concealment extending to November 1981.

In this case, neither conspirator distinctly or explicitly communicated to the other his assent to the "agreement." Rivenbark's statement to Wilson that he and Johnson should not see one another for a while, and the beatings Johnson inflicted on Wilson, are unilateral acts that in no way indicate the presence of an agreement. While Rivenbark's statement that "We got our alibis," and Johnson's compliance with Rivenbark's order to "make sure the stuff was gone," may suggest an obvious understanding to conceal the crime soon after it happened, this evidence does not show an ongoing distinct and explicit agreement to conceal.

The Court of Special Appeals correctly held that Johnson's challenged statements did not fall within the co-conspirator exception to the hearsay rule.

## II.

■ Although the Court of Special Appeals ruled that Johnson's taped statements were inadmissible against Rivenbark, the court refused to reverse Rivenbark's burglary conviction. The court reasoned that Rivenbark had neither mentioned the conviction in his brief nor argued that the conviction should have been reversed. Thus, the court concluded, the burglary conviction's validity was not before the court. 66 Md.App. at 390, 504 A.2d at 653. We disagree.

It is uncontested that, at his trial, Rivenbark properly preserved his objection to the admissibility of the statements. The issue related to both the murder and the burglary counts. Furthermore, Rivenbark's order of appeal was not expressly limited to the murder conviction. Consequently, the validity of the burglary conviction was before the Court of Special Appeals.

The Court of Special Appeals need not address an issue that an appellant failed to argue in his brief. *See, e.g., Foster, Evans and Huffington v. State,* 305 Md. 306, 315, 503 A.2d 1326, *cert. denied,* —— U.S. ——, ——, 106 S.Ct. 3310, 3315, 92 L.Ed.2d 723, 724, 745 (1986), and cases there cited; *Langworthy v. State,* 284 Md. 588, 596, 399 A.2d 578, 582–583 (1979), *cert. denied,* 450 U.S. 960, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981). In this case, however, the argument against the conviction for the greater offense of murder applies equally to the conviction for the lesser included offense of burglary. In this situation, an appellant is not required to state expressly that an argument applies not only to a greater offense but also to every lesser included offense.

■ Turning to this case, we observe that Rivenbark was convicted of felony murder. Burglary was the underlying

felony. In arguing against his felony murder conviction because of the improper admission of hearsay evidence, Rivenbark obviously put in issue the validity of his burglary conviction as well. Accordingly, we must reverse the Court of Special Appeals' decision to the extent that it held that Rivenbark was not entitled to a new trial on the burglary charges.[5]

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL IN ACCORDANCE WITH THIS OPINION. BALTIMORE COUNTY TO PAY COSTS.

---

**5.** Rivenbark also contends that the trial court erred in sentencing him to life imprisonment for felony murder and to 20 years to be served concurrently for burglary. We agree. In *Newton v. State*, 280 Md. 260, 273–274, 373 A.2d 262, 269 (1977), we held that a conviction for an underlying felony merges into a conviction for felony murder.