STATE of Iowa, Appellee,

v.

Adam ROSS, Appellant.

No. 96–1780.

Supreme Court of Iowa.

Jan. 21, 1998.

Brent D. Rosenberg of the Rosenberg Law Firm, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Martha E. Boesen and Ray Johnson, Assistant Attorneys General, and William R. Byers, County Attorney, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

Adam Ross appeals from convictions and sentences for (1) conspiracy to commit theft by deception, (2) extortion, and (3) aiding, making, establishing, or advertising a lottery. *See* Iowa Code §§ 706.1, 714.1(3) (conspiracy to commit theft by deception), 711.4 (extortion), 725.12 (lottery) (1993). He seeks to have his sentences and convictions reversed because, as he contends, the district court erred by (1) refusing to instruct the jury that "materiality" is an element of theft by deception, (2) failing to give his theory of defense instruction on the elements of theft by check, and (3) admitting hearsay statements. In addition, Ross contends the admission of the hearsay statements violated his right of confrontation under the Sixth Amendment to the federal Constitution. Finding no merit in any of these contentions, we affirm.

## I. *Background Facts and Proceedings.*

On September 22, 1993, Rita Hierstein tried to cash some certificates of deposit she had with the Brenton Bank in Waukee. At the time, Rita was in her eighties. Linda Pound, a bank employee, told Rita that she would be penalized for an early withdrawal. In response, Rita expressed concern about her ability to cover checks she had written and was not sure she could stop payment on the checks.

Pound helped Rita stop payment on two checks Rita had written to Family Savings Network (FSN), a telemarketing firm out of Dunwoody, Georgia. One check was for $299 and the other was for $2700.

The checks supposedly covered purchases for products Rita had made from FSN as part of the company's "Say No to Drugs" campaign. The purchases included 100 frisbees and "magnadexes," each embossed with the words, "Just Say No to Drugs." These products were to be donated to Rita's church, St. Boniface Catholic Church in Waukee. As part of the "incentive" for buying these products for $2999, Rita was promised her "fair share" of a "treasure chest" of prizes valued

at $300,000. This "fair share" and Ross's efforts to collect on Rita's "purchases" form the subject of the State's subsequent prosecution of Ross.

At the time Rita stopped payment on the checks, she also told Pound that she—Rita—had been receiving "lots of calls" from telemarketers. Pound helped Rita secure a new, unlisted phone number. Pound also put Rita in touch with the Iowa Attorney General's (AG) office.

The very next day—September 23—the AG rerouted Rita's phone calls to its Des Moines office. From that point on, all calls from FSN came into the AG's office and were tape recorded.

Marilyn Rand, a legal secretary in the AG's office, posed as "Rita" when answering the calls. Over the course of several months, Rand spoke with three FSN employees. Two of the three gave fictitious names. Ross posed as two different people, never using his real name.

On September 23 Patrick Pavek, posing as "Patrick Adams," was the first FSN employee to call and talk to Rand as "Rita" following the rerouting of Rita's number to the AG's office. Pavek was an FSN salesperson. He asked "Rita" to write a testimonial for FSN because she would come out "way ahead in the promotion" and told her that the award was only four weeks away. Pavek then asked "Rita" if she had taken care of everything and told her that FSN would send the products to St. Boniface.

The next day Pavek, again posing as "Adams," called "Rita" to wish her a "happy Friday" and to "double check" the spelling and address for St. Boniface. He told "Rita" that the verification department would soon be calling her. Pavek reminded "Rita" about the different categories of awards in the "treasure chest" and that he would "satisfy her and take care of her."

Later, the same day, Ron Riviezzo, FSN's verification manager, called "Rita" to make sure that "Rita" fully understood the terms and conditions of the sale and "award." Riviezzo confirmed the following with "Rita": 100 frisbees and "magnadexes" embossed with "Say No to Drugs" would be sent to St.

Boniface Catholic Church; in thirty days she would receive notice of her "treasure chest of awards," which could be anything from "home electronics, fabulous vacations, exotic jewelry, gold coins, and even cash." He told "Rita" the total "pot" was close to $300,000 and that FSN would notify her by phone about her award. Finally, he confirmed with "Rita" that she had made the purchases based upon the merchandise.

On October 1 Ross posing as "Adam Thompson" called "Rita" because FSN had received notice of the stop-payment order. Ross directed "Rita" to get a cashier's check at the bank and to send it by Federal Express to FSN. Ross gave her a toll-free phone number for Federal Express and FSN's account number with the delivery company. Ross told "Rita" he would call back in a short while to confirm that she had arranged for Federal Express to pick up the cashier's check.

Ross did call back. To encourage "Rita," he repeatedly told her she would "get back at least what she put in." His call had an ominous tone as well. He claimed her stop-payment order caused FSN six hours worth of paperwork and may have cost "Patrick Adams" his job. Ross accused "Rita" of writing a "bad check" for which she could be "locked up" because she "broke the law." He also told her to call her lawyer because he would call the police. "Rita" would not relent; she would not send any money until she knew what specifically she had "won."

Three days later, Ross called again, this time posing as "Michael Price" from the accounting department. He told "Rita" he was calling about the merchandise FSN had sent to St. Boniface Catholic Church and the two "bad checks." He said he wanted to clear up the matter. Playing on "Rita's" sense of guilt, he told her of the predicament in which she had placed "Adam Thompson" and that "Adam" might lose his job. In an attempt to secure at least some money, Ross was willing to "come down" from $3000 to $1500, but she would still receive her "fair share" of the "treasure chest." Ross repeatedly resisted telling "Rita" what she had already won. However, he did tell her she was a finalist and implied that if she were one of three

winners, she would win $100,000 of the $300,-000 "pot." When "Rita" resisted promising to send any money until she knew what she had won, Ross threatened her with lawsuits, criminal prosecution, and public humiliation, saying "you'll be the embarrassment of Waukee, Iowa."

With this, the AG decided to scale up its efforts. Investigator Barbara White learned of Ross's identity and location. On May 13, 1994, she spoke with Johnny Gutierrez, FSN's owner, who was posing as "Tim Andrews" in the customer service department.

Gutierrez defended FSN's legitimacy and asserted that the company prohibited its employees from using aliases. He also explained the sales promotion and said that Rita would have been told that she had won her "fair share" of the "treasure chest." According to Gutierrez this meant Rita would receive one of five prizes but not $100,000 in cash. He asserted the collection efforts in Rita's case were initiated because the products she had purchased had already been sent (they were not). Gutierrez distanced himself from Ross by claiming Ross had quit a year earlier. (In fact, Ross had left less than six months earlier because of a dispute over his compensation.) Gutierrez tried to evade responsibility for FSN by claiming stockholders owned the company.

Six months later, White spoke with Ross. An oblivious Ross explained in detail how he operated while working for FSN and what he did in Rita's case. He told White that despite pitching a "fair share" of a $300,000 "pot," "recipients" would never receive more than what they had sent FSN. Otherwise, he believed FSN would not turn a profit. According to Ross, FSN used whatever funds they received from people like Rita this way: twenty percent of the "winner's" money went to the purchases (in this case the "Just Say No to Drugs" campaign), twenty percent to the prize award, ten percent to the salesperson, and fifty percent to Gutierrez.

Later, the AG charged Ross with conspiracy to commit theft by deception, extortion, and aiding, making, establishing, or advertising an illegal lottery. The jury found Ross guilty of all three charges. The district court sentenced Ross to two five-year indetermi-

nate sentences on the conspiracy and extortion convictions and to a one-year term for the illegal lottery conviction. The court ordered the sentences to be served concurrently. In addition, the court fined Ross a total of $11,000.

Ross appealed from the convictions and sentences.

On appeal, Ross assigns three errors. First, he contends the district court should have instructed the jury that materiality is an element of theft by deception. Second, he contends the district court should have given the jury his requested instruction on theft by check to support his theory of defense to the extortion charge. Last, he contends the district court should not have admitted Gutierrez's statements to White because such statements were inadmissible hearsay and violated Ross's Sixth Amendment right of confrontation under the federal Constitution.

## II. *Scope of Review.*

 We review the district court's determination regarding jury instructions for errors at law. *See* Iowa R.App. P. 4; *State v. Breitbach*, 488 N.W.2d 444, 449 (Iowa 1992). In the case of hearsay rulings, our review is for correction of errors at law because admission of hearsay evidence is prejudicial to the nonoffering party unless the contrary is shown. *See State v. Rice*, 543 N.W.2d 884, 887 (Iowa 1996). We review constitutional challenges de novo. *State v. Mitchell*, 568 N.W.2d 493, 499 (Iowa 1997).

## III. *The Theft by Deception Instructions.*

Ross asked the district court to give the following marshaling instruction on theft by deception:

To assist you in determining whether there was an agreement or understanding to commit theft by deception, you are advised that the elements of the crime of theft by deception which must be established beyond a reasonable doubt are:

1. On or about the _____ day of September, 1993, the defendant did obtain money or the transfer of possession or

control of money from Rita Hierstein [and/or others].

2. The defendant voluntarily and intentionally deceived Rita Hierstein in one or more of the following ways:

a. _____

b. _____

3. The defendant knowingly and intentionally obtained transfer or possession, control or ownership of money from Rita Hierstein by the deception.

4. That the deception involved in paragraph 2 of this instruction was of a *material* nature.

Keep in mind that Count I of the Trial Information charges defendant Adam Ross with engaging in a conspiracy to commit theft by deception. No defendant is charged with the crime of theft by deception; the theft by deception is a conspiracy charge.

(Emphasis added.)

Ross also asked the court to give the following instruction on the definition of "material":

A statement is material if it has a natural tendency to influence, or be capable of influencing, the decision of the decision making body to which it is addressed.

The district court refused to give these proposed instructions. Instead the court instructed the jury as follows:

### INSTRUCTION No. 19

With regard to the conspiracy charge, the State must show an agreement to commit the crime of theft by deception. A person commits the crime of theft by deception if the person intentionally obtains the transfer of possession, control or ownership of money or property from another by deception.

### INSTRUCTION No. 20

As used in these instructions, "deception" consists of knowingly doing any one of the following:

1. Creating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true.

2. Failing to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously has created or confirmed.

3. Promising payment, the delivery of goods, or other performance which the actor does not ... intend to perform or knows the actor will not be able to perform. Failure to perform, standing alone, is not evidence that the actor did not intend to perform.

Instruction No. 19 defines the offense of theft by deception in the language of the theft by deception statute. *See* Iowa Code § 714.1(3). Instruction No. 20 defines "deception" in the language of subsections (1), (2), and (5) of Iowa Code section 702.9, which provides six definitions of "deception." Iowa Code chapter 702 is the definitional chapter for terms, words, or phrases used in the criminal code. *See id.* § 702.1 ("Wherever a term, word or phrase is defined in the criminal code, such meaning shall be given wherever it appears in the Code, unless it is being specially defined for a special purpose.").

None of the court's instructions defined "deception" to include the element of materiality. Ross contends the court erred by not including the element of materiality in these instructions. In support of his contention, he relies on the definition of "deception" in Iowa Code section 714.16(1)(*f*). This provision defines "deception" for purposes of consumer frauds covered in Iowa Code section 714.16. Section 714.16(1)(*f*) defines "deception" as "an act or practice which has the tendency or capacity to mislead a substantial number of consumers as to a material fact or facts."

We agree with the State that the general criminal code definition of "deception" in section 702.9 controls here rather than the definition of "deception" in section 714.16(1)(*f*). This is because the State charged Ross with conspiracy to commit theft by deception in violation of section 714.1(3). The State did not charge Ross with conspiracy to commit a consumer fraud in violation of section 714.16. *See State v. White,* 563 N.W.2d 615, 617 (Iowa 1997) (holding that where the State

elects to proceed under only one part of the statute, then what the State charges is the statute for the purposes of the case).

■ None of the definitions of "deception" found in subsections 1, 2, and 5 of section 702.9 mentions the word "materiality." Ross would therefore have us read the word "materiality" into those definitions.

In *State v. Hogrefe,* we noted that "[i]n enacting section 714.1(3), theft by deception, the legislature—for the most part—followed the lead of the American Law Institute Model Penal Code." 557 N.W.2d 871, 877 (Iowa 1996). *Compare* Iowa Code § 714.1(3), *with* Model Penal Code and Commentaries § 223.3, at 179 (1980). So we considered the Model Penal Code and Commentaries persuasive authority. *Hogrefe,* 557 N.W.2d at 877.

With respect to theft by deception, the Commentaries pertinently provide:

> [Section 223.3] adopts a comprehensive definition of criminal fraud. The term "deception" has been substituted for "false pretense or representation." The substituted term includes misrepresentations of value, law, opinion, intention, or other state of mind, as well as certain cases where the actor knowingly takes advantage of another's misinformation, though he may not be responsible for it. *There is no requirement that the deception be material....* It suffices for conviction that the deception was effective, whether alone or with other influences, in securing the property for the actor.

Model Penal Code and Commentaries § 223.3 cmt. 1, at 181 (emphasis added).

We likewise hold that materiality is not an element of theft by deception in Iowa Code section 714.1(3). Accordingly, the district court did not err when it refused Ross's proffered jury instructions on theft by deception.

### IV. *The Theory of Defense Instruction.*

■ Iowa Code section 711.4 pertinently defines extortion as follows:

> A person commits extortion if the person does any of the following with the purpose of obtaining for oneself or another anything of value, tangible or intangible, including labor or services:
>
> ....
>
> 2. Threatens to accuse another of a public offense.
>
> 3. Threatens to expose any person to hatred, contempt, or ridicule.
>
> ....
>
> 5. Threatens to ... cause some public official or employee to take ... action.
>
> It is a defense to a charge of extortion that the person making a threat other than a threat to commit a public offense, reasonably believed that the person had a right to make such threats in order to recover property, or to receive compensation for property or services, or to recover a debt to which the person has a good faith claim.

In the marshaling instruction on extortion, the district court required the State to prove that Ross

> 1. wrongfully and intentionally threatened to accuse Rita Hierstein of a public offense; or expose Rita Hierstein to hatred, contempt or ridicule; or to cause some public official or employee to take some action against Rita Hierstein.
>
> 2. intended to communicate the threat towards Rita Hierstein.
>
> 3. made [the threat] for the purpose of obtaining something of value for [Ross] or another person, which [Ross] knew he was not entitled to receive.
>
> 4. did not reasonably believe he had a right to make threats in order to be paid for property or services or to recover a debt to which he had a good faith claim.

In a separate instruction, the district court instructed the jury on Ross's theory of defense to the extortion charge:

> With regard to element four of [the marshaling instruction on extortion] whether the defendant reasonably believed that he had a right to make threats depends on the facts and circumstances existing at the time of the threat.
>
> If the defendant believed he had a right to make the threat and you find that a reasonable person under the circumstances

would believe they had a right to make the threat, then the defendant would not be guilty of extortion if the threat was made to recover a debt to which the defendant had a good faith claim. "Good faith" means honesty in fact in the conduct or transaction concerned.

Despite the fact that the court instructed on the defense in terms of the statutory language in section 711.4, Ross wanted more. He requested the court to give the following instruction on theft by check in Iowa Code section 714.1(6):

> With regard to element number 4 of [the marshaling instruction on extortion,] whether the defendant reasonably believed he had a right to make threatening statements depends on the facts and circumstances existing at the time of the statement:
>
> Theft by check is committed when a person:
>
> 1. makes, utters, draws, delivers or gives a check, and
>
> 2. obtains property or services in exchange for the check, and
>
> 3. the person knows that such check will not be paid when presented.
>
> If the State fails to prove that the defendant did not reasonably believe he had a right to make the threat, then the defendant must be found not guilty of extortion.

 Ordinarily, the district court must instruct on a defendant's theory of defense provided the defendant makes a timely request, the requested theory of defense instruction is supported by the evidence, and the requested instruction is a correct statement of the law. *State v. Johnson,* 534 N.W.2d 118, 124 (Iowa App.1995). Evidence in support of the requested instruction must be substantial. *State v. Broughton,* 425 N.W.2d 48, 51–52 (Iowa 1988). Evidence is substantial if it could convince a rational fact finder that the defendant has established the affirmative defense. *Id.*

Under the evidence in this case, we think Ross was not entitled to his requested theory of defense instruction. There was no evidence that Rita ever received any property or services in exchange for the checks she gave FSN. Nor was there any evidence that at the time she issued the checks Rita knew the checks would not be paid when presented. In short, the evidence was insufficient to convince a rational fact finder that Rita had committed the crime of theft by check. In addition, we have serious reservations that defendants charged with theft by deception and extortion may ever advance alleged criminal conduct on the part of their victims as a defense to their extortion.

We conclude the district court committed no error when it refused Ross's requested theory of defense instruction.

V. *Alleged Inadmissible Statements of Gutierrez.*

At trial, Ross's counsel objected to the introduction of Gutierrez's statements to White. Counsel first objected on relevancy and hearsay grounds. The State responded it was not offering Gutierrez's statements for their truth because everything Gutierrez said to White were lies. Rather the State offered the statements as those of a coconspirator in furtherance of a conspiracy to defraud Rita through the $300,000 "treasure chest" prize scheme. The State argued that Gutierrez's lies to White were an attempt to further the conspiracy by covering up the fraud. Seen in this light, the State contended, Gutierrez's statements were an exception to the hearsay rule.

Ross's counsel responded that Ross had left FSN *before* Gutierrez spoke with White. At this point counsel threw up his hands: "There are just so many things wrong with getting into that evidence that I—I find it objectionable."

The State continued: Gutierrez was active in May 1994 in covering up the FSN $300,000 "treasure chest" pitch and thus his statements were made to conceal the illegitimacy of the operation. The cover-up, the State insisted, was part of the conspiracy.

At this point, the nature of the objection by Ross's counsel began to change:

> THE STATE: Are we alleging that Mr. Ross was at Family Savings Network in May of 1994? No, we're not, but we are alleging that the defendant even at a date

long after that and Mr. Gutierrez were very much interested in making sure that investigators for the State would not be able to tie them to Family Savings Network and the cover-up—when you do a prize scheme like this, the cover-up is a very needed part of it. ·

DEFENSE COUNSEL: The objection now appears to be fairly clear is that you have a Bruton problem.

THE COURT: What?

DEFENSE COUNSEL: You have a Bruton problem and in the Bruton case statements made to an investigator of law enforcement after the discovery of the crime of conspiracy offered against the defendant by other parties are not admissible, and it raises the confrontation problem, additional hearsay.... Questioning by law enforcement are simply not admissible against any other party, only against themselves.

In short, Ross's counsel urged a mixture of objections: hearsay and the inapplicability of the coconspirator exception to the hearsay rule based on a *Bruton* confrontation violation. The district court overruled the objection and admitted into evidence Gutierrez's statements to White.

Ross contends here that the district court erred because these statements were made after the objects and goals of the conspiracy were achieved. He also contends the statements were inadmissible because they were made to a known government investigator. Finally, he contends the admission of such statements violated his Sixth Amendment right to confrontation under the federal Constitution.

■ A. *Termination of the conspiracy.* On this issue, Ross vigorously contends that by May 13, 1994—when White talked to Gutierrez—Ross had done all he could under the circumstances to withdraw from the conspiracy because he no longer worked for FSN. Ross insists that Gutierrez, through his efforts to cover up his own role, could not re-involve Ross in a conspiracy from which Ross had already withdrawn. For these reasons, Ross concludes, the coconspirator "exception" to the hearsay rule does not apply and

Gutierrez's statements to White were therefore inadmissible hearsay.

1. *Applicable law.* Article VIII of the Iowa Rules of Evidence codifies the law on hearsay. Rule 801 defines the following:

(a) **Statement.** A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.

(b) **Declarant.** A "declarant" is a person who makes a statement.

(c) **Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(d) **Statements Which Are Not Hearsay.** A statement is not hearsay if—

. . . .

(2) *Admission by Party–Opponent.* The statement is offered against a party and [is] ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Iowa R. Evid. 801.

Thus, a statement is hearsay if it is offered to prove the truth of the matter asserted. Statements not offered for the truth of the matter asserted do not constitute hearsay and should not be excluded on such grounds. *State v. Waterbury*, 307 N.W.2d 45, 50 (Iowa 1981).

■ Statements by a coconspirator of a party during the course and in furtherance of the conspiracy are likewise not hearsay. Such statements are admissible against the party as an admission by a party-opponent. So it is inaccurate to characterize this rule as an exception to the hearsay rule.

■ A conspiracy is a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act in an unlawful manner. *State v. Blyth*, 226 N.W.2d 250, 263 (Iowa 1975). The conspiracy does not depend on the fulfillment of the agreement, only that there is an agreement. *Id.* And the agreement may be established by either direct or circumstantial evidence. *Id.*

"When there is substantial evidence of a conspiracy, whether the offense charged is conspiracy or not, everything said by any conspirator in furtherance of the common purpose is deemed to have been said in behalf of all parties to the conspiracy." *State v. Kidd,* 239 N.W.2d 860, 864 (Iowa 1976). For the rule to apply, two conditions must be met. *Id.* "First, the statement must have been made during the pendency of the conspiracy. Second, it must have been in promotion of the object or design of the conspiracy." *Id.*

Once there is substantial evidence of a conspiracy, the burden is upon the conspirator to show it has ended. *Id.* Unless the conspiracy has ended, every act in furtherance of it is deemed a renewal or continuance of the conspiracy. *State v. Wedelstedt,* 263 N.W.2d 894, 899 (Iowa 1978). Thus, a conspiracy may continue into the concealment phase. *Kidd,* 239 N.W.2d at 864.

In the absence of a showing that the conspiracy has ended, the conspirator remains a member of the conspiracy until the conspirator withdraws. *United States v. Walls,* 70 F.3d 1323, 1327 (D.C.Cir.1995). A conspirator may withdraw by admitting to the authorities the conspirator's involvement in the conspiracy. *Id.* Or the conspirator may withdraw by communicating the conspirator's abandonment of the conspiracy in a manner reasonably calculated to reach coconspirators. *Id.*

2. *The merits.* As mentioned, Ross attempts to brand Gutierrez's statements to White as hearsay, contending that the conspiracy, if any, had ended by the time Gutierrez made the statements.

We are convinced there was substantial evidence of the conspiracy. The hotly contested issue is whether Ross's involvement in the conspiracy had ended by the time Gutierrez made the statements to White.

As in most illegal schemes, the perpetrators agree either expressly or tacitly that they will do whatever it takes to conceal the scheme from victims like Rita and from the authorities. They do so to continue the scheme or at least to keep the fruits of it and to avoid prosecution. *Cf. Waterbury,* 307

N.W.2d at 50 (holding that otherwise hearsay statements were admissible because they showed that codefendants conspired to commit murder and as part of the conspiracy agreed to take steps to conceal the conspiracy after its primary goal was achieved).

From the impersonations, lies, and threats in this case, the jury could reasonably find that concealment was part of the conspiracy and in furtherance of it. In his statements to White, Gutierrez defended FSN's legitimacy and the legitimacy of the "treasure chest" prize scheme. He also claimed that the company prohibited the use of aliases by its salespeople and asserted that collection efforts in "Rita's" case were started because the products she purchased had already been sent. The jury could find that all these statements were lies. The jury could also find these statements were generally designed to preserve the object of the conspiracy—the $300,000 "treasure chest" prize scheme—and to conceal the scheme's illegality so as to avoid prosecution.

The jury could also find that the conspiracy continued until Ross admitted the fraud and his involvement in it to White. This was long after White had talked to Gutierrez.

It is true that Ross left FSN some six months before White talked to Gutierrez. He left not because he wanted to distance himself from the illegal scheme but because of a compensation dispute with FSN. There is no evidence that Ross ever told Gutierrez that he—Ross—(1) wanted no part of the conspiracy or (2) wanted Gutierrez to discontinue the scheme and its concealment. Experience and common sense tell us that schemers and cheaters rarely walk into a police station and admit their crimes. Given this human proclivity, the jury could easily infer that Ross wanted Gutierrez to do whatever it took to continue the concealment so that Ross would not be implicated criminally and he could keep the fruits of the conspiracy. Thus, any statement Gutierrez would thereafter make to continue the concealment would be in furtherance of the conspiracy and made in behalf of Ross.

We conclude the statements Gutierrez made to White were part of the conspiracy

and made in furtherance of it. The statements were not hearsay but admissions of a party-opponent under Rule 801(d)(2)(E). The district court was therefore correct in admitting the statements.

■ The statements were not hearsay for another reason: They were not offered to prove the truth of the matters asserted by Gutierrez. Rather the statements were offered to prove that Gutierrez had made the statements and had made them as part of the concealment phase of the conspiracy. *See Waterbury,* 307 N.W.2d at 50.

In *Waterbury,* a woman conspired with her codefendant-brother to kill her husband. During questioning by the authorities, she claimed that an unknown assailant had killed her husband. Later, she claimed the assailant was her lover, one Ronald Walters. Finally, she signed a statement in which she said her brother killed her husband. We concluded the statements about the unknown assailant and the lover were not hearsay as the codefendant-brother contended and were therefore admissible. We said:

> The State argues the first two statements were not hearsay as to [the codefendant-brother], because they were not offered as proof of the matters asserted therein. We agree. These statements were not offered to prove the fictitious persons described actually committed the murder. Rather, they were offered to prove [the codefendant-sister] had made the statements, and made them as a part of the concealment phase of the conspiracy.

*Id.* (citations omitted).

■ B. *Statements to a known government investigator.* Ross points out that Gutierrez knew White was a government investigator when he made the challenged statements to her. Thus, he contends, under Federal law the statements were "not admissible under the conspiracy hearsay exception because [they were] not made 'during the course and in furtherance of the conspiracy.'" In support of his contention, Ross cites *United States v. Gallo,* 654 F.Supp. 463 (E.D.N.Y.1987) and Federal Rule of Evidence 801(d)(2)(E).

We agree with the State that *Gallo* is easily distinguishable. One of the issues before the court was whether a defendant was entitled to discovery of coconspirators' statements made to a known government investigator. The court in *Gallo* did say that "statements made to known government agents by coconspirators would not be admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence, because they would not have been made 'during the course and in furtherance of the conspiracy.'" *Gallo,* 654 F.Supp. at 468–69.

However, one must read this statement in context. Further on in the opinion, the court makes clear that when it made this statement it was referring to statements of a coconspirator who is a prospective government witness. *Id.* at 478. Presumably such a coconspirator is cooperating with the government, and presumably such statements are damaging because they *confirm* the conspiracy rather than *further* it.

In contrast, statements made to a known government investigator to conceal the object of the conspiracy while that object is still being pursued are logically made during the course and in furtherance of the conspiracy. As mentioned, this was the rationale this court used in *Waterbury* when it held that a coconspirator's untrue statements about who killed her husband were admissible. 307 N.W.2d at 50.

We therefore find no merit in Ross's contention that *Gallo* makes Gutierrez's statements to White inadmissible hearsay.

■ C. *The alleged Sixth Amendment violation.* Without much argument, Ross finally contends that Gutierrez's statements to White were inadmissible under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* holds that the Confrontation Clause of the Sixth Amendment to the federal Constitution makes inadmissible a non-testifying codefendant's confession incriminating the other defendant. *Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622, 20 L.Ed.2d at 479. The admission of such a confession violates a defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. *Id.*

We can quickly dispose of Ross's contention because the State tried Ross alone. Gutierrez was not a codefendant. *Bruton* simply does not apply.

### VI. *Disposition.*

Because materiality is not an element of theft by deception, the district court committed no error when it refused to instruct otherwise. Nor did the court err in refusing Ross's requested theory of defense instruction where there was no substantial evidence to support it. Gutierrez's statements to investigator White were admissible as admissions of a party-opponent because the statements were made by a coconspirator of a party during the course and in furtherance of a conspiracy. In addition, admission of such statements into evidence did not violate Ross's constitutional rights.

Finding no error, we affirm.

**AFFIRMED.**