# IN THE COURT OF APPEALS OF IOWA

No. 21-1893
Filed April 10, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**THON ROBIN BOL,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.


        A defendant appeals his convictions for attempted murder, intimidation with a dangerous weapon, and willful injury causing serious injury.  **AFFIRMED.**


        Christine E. Branstad of Branstad & Olson Law Office, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


        Considered by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

Thon Bol was one of five defendants charged in a late-night drive-by shooting at a Des Moines residence in 2021. He was tried with Odol Othow and Owo Bol.[1] The district court severed the trials of two other defendants—Caine Dominguez-Schiesl and Reath Yak. A jury found Bol guilty of attempted murder, intimidation with a dangerous weapon, and willful injury causing serious injury.

Bol appeals, contesting the weight of the evidence supporting his convictions. He also renews his hearsay objections to the admission of a phone conversation with his sister and the recorded statements of Dominguez-Schiesl and Yak. In another evidentiary challenge, he urges that the district court abused its discretion in allowing expert testimony from a police detective. Lastly, Bol argues the court abused its discretion by not removing a crying juror. After a careful review of Bol's claims, we find no grounds to grant a new trial.

## I.     Facts and Prior Proceedings

"We know there were three guns. We know there were five people in that car." Des Moines Police Department Detective Jeffrey Shannon emphasized this evidence in his testimony at Bol's trial. Bol's case is the last in a series of appeals related to this drive-by shooting to reach our review.[2]

---

[1] Owo and Thon Bol are brothers. For brevity and clarity, we will use the last name Bol when referring to Thon in this opinion.

[2] Our court affirmed the convictions in the other four other cases: *See State v. Othow*, No. 21-1928, 2024 WL 960960 (Iowa Ct. App. Mar. 6, 2024); *State v. Yak*, No. 21-1185, 2024 WL 111651 (Iowa Ct. App. Jan. 10, 2024); *State v. Bol*, No. 22-0158, 2023 WL 7391657 (Iowa Ct. App, Nov. 8, 2023); *State v. Dominguez-Schiesl*, No. 21-1402, 2023 WL 5949177 (Iowa Ct. App. Sept. 13, 2023).

Here are the foundational facts as stated in his brother's case:

> N.M., who was sixteen years old, lived with her mother, sister, eight-year-old brother, and two-year-old nephew, D.M., at a home in Des Moines. On March 1, 2021, she planned and held a surprise birthday party for her sister. By 10:00 p.m., the party had died down. N.M. was left at home with her brother and nephew. By 10:30 p.m., her brother was asleep in his room, and N.M. sat with her nephew while he watched cartoons in the living room. After N.M. decided it was time for both her and her nephew to retire for the evening, she went outside to retrieve her cell phone charger from her mother's vehicle parked in the driveway. D.M. remained on the couch, watching cartoons.
>
> While N.M. was in the driveway, a vehicle stopped in front of the house. N.M. saw at least four people in the car, one who was wearing a black ski mask. N.M. inquired, "Who are you?" One of the occupants responded, "You know who this is, motherfucker," and shots rang out. Twenty to thirty shots were fired from the vehicle. N.M. dove into her mother's car, fearing that her brother or nephew might be shot if she ran back into the home. The car eventually pulled away and N.M. ran to the front door of her home to make sure her brother and nephew were all right. But the door was jammed, and N.M. could not get in. She ran to a neighbor's house to call the police, but no one came to the door. She went to another neighbor's house who let her use a cell phone. N.M. then ran home. By that time, her brother had opened the door. N.M. found her nephew lying in the hallway, crying softly. He had been shot in the back of his head. N.M. managed to call 911. Two-year-old D.M. arrived at the hospital in critical condition. He survived but has permanent brain damage.

*Bol*, 2023 WL 7391657, at *1.

After receiving the 911 call, Des Moines police officers canvassed the neighborhood. They gathered witness statements and obtained footage of the attack from neighbors' security cameras. From that footage, police could see that the assailants' vehicle was a dark Nissan SUV. The local officers notified other law enforcement to be on the lookout for an SUV matching this description.

About an hour later, police received an alert from a passerby concerning a single-vehicle crash on westbound Interstate 80. Dallas County Sheriff's Deputy

Nicholas Merwald arrived at the crash scene, noticing the disabled SUV matched the one described in the broadcast. When he approached the black Nissan Rogue, he asked the person in the driver's seat—later identified as Bol—if everything was okay.[3] Bol said that he had swerved to avoid hitting a deer and that they were waiting for his sister to come from Sioux City to pick them up.

Deputy Merwald asked how many occupants were in the car. Bol said four. (There were five.) None had called 911 to report the crash despite having working cellphones. Officers testified they had sat there for at least fifteen minutes with the airbags deployed. Deputy Merwald called for backup. When state troopers arrived, they removed the occupants from the car. Bol and Yak were in the front seats; Dominguez-Schiesl, Owo Bol, and Othow were in the back seat. Bol emerged first, through the passenger side, as the driver's door was against the cable barrier. As he exited, State Trooper Kyle Ratzesberger spotted a spent nine-millimeter bullet casing on the floorboard. Officers learned that Bol had an outstanding warrant and detained him in a police cruiser while they removed the others from the SUV.

While Bol waited in the cruiser, he called his sister. They spoke in a mix of English; Arabic; and Nuer, a Sudanese language.[4] Their conversation was recorded on the dash camera. "We do got macs in the car," Bol said. His sister

---

[3] At trial, the State theorized that Yak was driving, and that Bol switched places with him before police arrived.

[4] The State offered the testimony of interpreter Dhoal Larjin to translate Bol's phone call to his sister. Larjin testified that they first spoke Nuer, in which the word "mac" meant gun. The sister also said, "it would be better if you get it out." When she switched languages, it was to Arabic. She said: "If they find the gun, it will be another problem." And: "So where did you put the gun?" Bol said: "We hid it."

asked: "Whose mac is it?"  Bol answered: "There's three of 'em."  His sister then said: "This is bad, Thon," and asked: "Who is all in the whip?"  Bol named the four other occupants.  In the middle of the conversation, Bol asked his sister: "you're like an hour and thirty away?"  She said she was "really trying" and that "it says two hours."

Meanwhile, officers searched the Nissan Rogue and found a firearm under the driver's seat and two extended-capacity magazines—one on the floor of the backseat and one under the driver's seat.  When they searched Owo Bol, they found two more firearms in his waistband.  Officers also found seventeen shell casings—some strewn about the car, some in an otherwise empty water bottle.  Ballistics testing later found these casings consistent with having been fired from those three guns.  When police searched Bol, they found a black ski-mask.  Police also recovered a Snapchat video from Owo Bol's phone showing the back seat passengers brandishing guns.[5]

Law enforcement then took all five detainees to the station for questioning.  In his interview, Dominguez-Schiesl told detectives that he did not remember coming to Des Moines.  He also claimed not to know the names of the others in the car, saying they were "just friends, people I know," and that he met them at McDonald's, and asked them for a ride.  They all were "just going the same way."[6]  He said he didn't touch a gun and didn't know anybody had a gun.

---

[5] Investigators later determined that these guns were the ones recovered from the car and Owo Bol.

[6] At trial, the State theorized that story couldn't be true.  The State offered evidence that the Nissan Rogue belonged to Yak's parents.  Yak picked up Thon and Owo Bol in Sioux City, then met Dominguez-Schiesl and Othow in Omaha before all

Yak was less communicative when detectives interviewed him. He answered most questions with "mmhmms" and "un-uhs." When he did talk, he said he "didn't have anything to do with it" but admitted the Nissan Rogue belonged to his parents. He claimed that he came to Des Moines to visit family. He also kept repeating "I know him,"—referring to Owo Bol. When Detective Shannon said: "you shot a two-year-old boy," Yak said: "So that's who came to the door?" Shannon replied: "What's that?" Yak repeated his earlier question. Detective Shannon said: "What door?" But Yak replied: "Never mind."

The State charged Bol and his co-defendants in a joint trial information with two counts of attempted murder, class "B" felonies in violation of Iowa Code section 707.11 (2021); intimidation with a dangerous weapon, a class "C" felony in violation of section 708.6; and willful injury causing serious injury, a class "C" felony in violation of section 708.4(1). The State set out to try all five defendants together. But after opening statements, all defendants except Yak moved to sever their trials. The district court granted that motion. Yak and Dominguez-Schiesl were tried individually. The court later granted the State's motion to rejoin the other three defendants.

On day two of Bol's trial, the State played the 911 call from the night of the shooting. The jury could hear D.M.'s "soft, rhythmic" cries in the background. According to defense counsel, during the presentation of that evidence, Juror 31 started "sobbing uncontrollably" and "physically trembling." The prosecutor told

---

traveling to Des Moines. Dominguez-Schiesl's phone showed he was in Omaha at 1:45 p.m. and then in Council Bluffs at 8:16 p.m. When asked who went to Des Moines, Othow said, "Me, Owo, Thon, Reath, and Caine." The State contended they were coming together and they were "coming for a mission."

the court he had a "different observation of the same juror," but he also said that he was not suggesting "that jurors don't shed tears during a trial, but that's the nature." Bol asked the court to replace Juror 31 with an alternate. Bol's attorney said she worried "about jurors not handling the functions which they agreed to during voir dire, which is to judge the case on the law and the facts, not emotions."

The judge dismissed these concerns, reasoning:

> [Juror 31], as well as the other jurors that were selected, all indicated while under oath that they would be able to follow the Court's instructions, which included—will include that they are to make the decision not based upon emotion. As such, the Court believes that at this juncture the motion should be denied.
> That being said, the Court will continue to observe, and if there are further reasons to believe that we need to question this individual juror, that issue can be readdressed, if need be. But, as of now, I'm going to deny the motion.

The trial continued. The State called sixteen witnesses. Among them was Detective Shannon, who testified to his experience "working on cases involving multiple suspects." Shannon also testified that he could hear in the surveillance video "what appears to be multiple firearms being fired" continuously for about ten seconds. N.M testified that she saw one person from the SUV shooting; he wore a black ski mask and was on the passenger side. N.M. did not remember if the driver—who was closest to her—wore a ski mask nor did she see his face. The State also offered a recording of Bol's call with his sister, as well as the recorded statements of Yak and Dominguez-Schiesl. The State also introduced a Snapchat video of Owo Bol, Othow, and Dominguez-Schiesl brandishing guns after the shooting. Bol did not testify. After the six-day trial, the jury convicted Bol on one of the two counts of attempted murder, as well as a lesser-included offense of intimidation with a dangerous weapon and willful injury causing serious injury.

Bol moved for a new trial, alleging the verdicts were against the weight of the evidence. The court denied his motion and sentenced him to thirty-five years in prison with eligibility of parole after twenty-two and one-half years. Bol appeals.

## II.    Scope and Standards of Review

We review the denial of Bol's motion for a new trial for an abuse of discretion. *See State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). We also review most evidentiary rulings for abuse of discretion. *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017). But hearsay rulings are an exception; we review them for correction of legal error. *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021). We view the admission of hearsay as prejudicial to the resisting party unless the offering party can show harmless error. *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). On the question of removing Juror 31, we will not reverse unless Bol can show the court abused its discretion. *State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015). As a reviewing court, we resist "second-guessing the trial judge's estimation of a juror's impartiality." *State v. Jonas*, 904 N.W.2d 566, 586 (Iowa 2017) (Waterman, J., concurring specially) (quoting *Skilling v. United States*, 561 U.S. 358, 386 (2010)).

## III.    Analysis

On appeal, Bol makes five arguments: (1) the guilty verdicts were contrary to the weight of evidence; (2) his sister's statements were inadmissible hearsay; (3) the recorded interviews of Dominguez-Schiesl and Yak also were inadmissible hearsay; (4) the district court abused its discretion in admitting Detective Shannon's expert testimony; and (5) that the court should have removed Juror 31 because of doubt about her impartiality. We will address each issue in turn.

## A.    Weight of the Evidence

Bol first argues that the district court abused its discretion in denying his motion for new trial under Iowa Rule of Criminal Procedure 2.24(2)(b).[7]  The court may grant a new trial if the verdict is contrary to the weight of the evidence.  *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998).  The weight-of-the-evidence analysis involves a question of credibility: does more credible evidence support one side than the other?   "Only in the extraordinary case, where the evidence preponderates heavily against the verdict, should a district court lessen the jury's role as the primary trier of fact and invoke its power to grant a new trial."  *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008).

Bol contends "the evidence presented by the State does not indicate [he] committed the crimes alleged" nor did it "indicate he was in the car at the time of the shooting."  True, N.M. did not see all five occupants of the car outside her home and could not positively identify any of the shooters.  But her limited view did not preponderate heavily against the verdicts.

"Circumstantial evidence may be equal in value to and sometimes more reliable than direct evidence."  *State v. Stamper*, 195 N.W.2d 110, 111 (Iowa 1972).  The State offered a wealth of evidence pointing to Bol's guilt.  For instance, law enforcement found Bol in the driver's seat after the SUV seen on surveillance video at the shooting scene crashed on the interstate shortly after leaving Polk County.  The SUV also contained three guns, all of which had been fired at the

---

[7] The State reads Thon's brief as presenting both sufficiency and a weight-of-the-evidence claims.  We do not.  Because he mentions the sufficiency of evidence only when quoting a case for the standard of review on another issue, we do not address that ground.

scene. Bol had a black ski mask. And N.M. recalled one of the shooters wearing a black ski mask. Most damning, the jury heard a recording of Bol admitting to his sister that they had guns in the car and naming the other four occupants.

When faced with Bol's weight-of-the-evidence challenge, the question for the district court was not whether enough credible evidence supported the jury's verdicts or alternative verdicts, but whether the "greater amount of credible evidence" suggested the jury's verdicts were a miscarriage of justice. *State v. Jackson Thomas*, 987 N.W.2d 455, 464 (Iowa Ct. App. 2022) (citation omitted). Given the strong circumstantial evidence in the record, the court did not abuse its discretion in denying Bol's motion for new trial.

## B.    Hearsay: Phone Call with Sister

As noted above, a key piece of evidence for the State was Bol's recorded conversation with his sister. In his second issue, Bol claims that recording contained inadmissible hearsay. Alternatively, he argues that if we find his sister was a coconspirator under Iowa Rule of Evidence 5.801(d)(2)(E), the court should have admitted the entire phone call under the rule of completeness.[8]

Bol unsuccessfully moved pretrial to exclude the recorded conversation with his sister. The court allowed the evidence under Rule 5.801(d)(2)(E), which provides that statements "made by a coconspirator of a party during the course and in furtherance of the conspiracy" are not hearsay. Bol renewed this argument

---

[8] The State argues that Bol did not preserve error on this alternative argument. We agree. At trial, Bol did not make an offer of proof to show what was discussed outside the edited version played for the jury. Without that showing, we can only speculate about the substance of that unredacted call. Thus, error was not preserved for our review. *See State v. Lacey*, 968 N.W.2d 792, 806 (Iowa 2021).

in his motion for a new trial, asserting that the State did not present evidence that Bol's sister conspired to commit the shooting.

The trial court stuck to its original ruling:

> [T]he conversation between Thon Bol and his sister clearly articulated that the sister was attempting to pick the group up from the scene of the accident to evade identification and their ultimate capture. This attempt to assist them in leaving the area was clearly in furtherance of the conspiracy. The conversation was evidence of the sister's aiding and abetting the concealment of the crime.

The court cited *State v. Ross*, 573 N.W.2d 906, 915 (Iowa 1998), and *State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976), for the proposition that a conspiracy may continue into the concealment phase.

In this evidentiary context, a conspiracy means "a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act in an unlawful manner." *State v. Huser*, 894 N.W.2d 472, 504 (Iowa 2017) (citation omitted). The proponent of the evidence must prove the existence of a conspiracy by a preponderance of the evidence. *Id.* "Proof of a conspiracy must include evidence independent of the coconspirator's statement." *State v. Dullard*, 668 N.W.2d 585, 596 (Iowa 2003). When, as here, the district court determines that a conspiracy existed, we review that determination for substantial evidence. *See Huser*, 894 N.W.2d at 504. "Once a conspiracy is established, two conditions must be met for rule [5.]801(d)(2)(E) to apply: the statement must have been made during the pendency of the conspiracy, and it must be in promotion of the conspiracy's object or design." *State v. Tangie*, 616 N.W.2d 564, 571 (Iowa 2000).

On appeal, Bol argues that the State did not prove a conspiracy involving his sister. He asserts the record did not show that she knew in advance why he and the others went to Des Moines or had any other information related to the shooting. The State counters that rule 5.801(d)(2)(E) does not require proof that Bol's sister was part of a conspiracy before the shooting. In its view, the rule applies if she joined a conspiracy in the concealment phase. The State relies on *State v. Elam*, which held that a conspiracy after the fact to conceal a crime or to further the escape of a perpetrator will support the admissibility of coconspirator statements tending to establish the existence of the after-the-fact activities. 328 N.W.2d 314, 319 (Iowa 1982). We agree with the State's reasoning.

Granted, "*Elam* does *not* stand for the proposition that proof of a conspiracy by accessories after the fact, without more, can serve to render admissible statements made by the after-the-fact conspirators concerning the primary crime." *State v. Florie*, 411 N.W.2d 689, 696 (Iowa 1987). But that is not what happened here. The sister's statements were admissible because Bol's efforts to hide the guns and avoid contact with the police revealed his guilty knowledge. *See Elam*, 328 N.W.2d at 319; *see also* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.801:15 n.31 ("Statements establishing a conspiracy by accessories after the fact to conceal a crime are admissible to establish the after-the-fact activities which may be relevant to establishing the initial offense through demonstration of guilty knowledge. However, without more, statements by the accessories after the fact relating to the initial offense are not admissible until there is evidence of the conspiracy to commit the initial offense."). As the prosecutor argued in closing, Bol told his sister that there were three "macs" (the word for guns in Nuer) in the

SUV. The prosecutor suggested that using another language was a "clever way of hiding what you're trying to say." The sister said, "If they find the guns, that's a problem." Bol said, "I know."

Even assuming the sister's statements related to the shooting itself and not just the perpetrators' efforts to escape or conceal their crime, the record supports the finding of a conspiracy among the five occupants of the SUV. The State proved by a preponderance of the evidence that the defendants traveled to Des Moines together and used three guns in the drive-by shooting at N.M.'s home. There were "three guns. . . . Five people in that car." The State showed the Snapchat video of Owo, Othow, and Dominguez-Schiesl brandishing guns and "celebrating what they just did." And the State emphasized that the occupants stayed together after the shooting, waiting in the vehicle for Bol's sister to pick them up. Bol's sister joined the conspiracy when she agreed to pick them up after they crashed during their get-away, thereby helping them escape and conceal the evidence of their crimes. *See Ross*, 573 N.W.2d at 915 ("Unless the conspiracy has ended, every act in furtherance of it is deemed a renewal or continuance of the conspiracy."). The phone call occurred during the ongoing conspiracy and promoted its object. *See id.* We find no error in the district court's decision to admit her statements.

**C.      Hearsay: Co-Defendants' Recorded Statements**

Bol raises a second hearsay objection. He contends that the district court erred in allowing evidence of recorded police interviews with Dominguez-Schiesl and Yak, who were tried separately. At trial, the State sought to introduce these recordings as coconspirator statements under Rule 5.801(d)(2)(E). As an alternative, the State argued that because the statements were false, it was not

offering them for the truth of the matter asserted but to show consciousness of guilt. The district court agreed that the State proved an ongoing conspiracy. But the court ultimately admitted the statements as non-hearsay under the definition of rule 5.801(c)(2), reasoning:

> The Court, after further research and investigation, has come to a conclusion, in fact, those statements, quite frankly, as argued by the State, are not hearsay for the purpose that they are being offered here today. In other words, they're not being offered for the truth of the matter asserted, and as such, the Court believes that the State can use them in this capacity. . . . They're not being offered for the truth of the matter asserted, but rather to show the evasiveness or lying of the individuals.

The court cited three cases in support of its ruling: *State v. Crowley*, 309 N.W.2d 523, 524 (Iowa Ct. App. 1981); *State v. Frederiksen*, No. 15-0844, 2016 WL 4051655, at *8 (Iowa Ct. App. July 27, 2016), and *United States v. Brown*, 560 F.3d 754, 765 (8th Cir. 2009). Those cases generally hold that statements offered to prove the falsity of the matter asserted are not hearsay.

On appeal, Bol argues, "The State cannot rely on assumptions of a conspiracy to affix consciousness of guilt to the defendants currently on trial." He contends that because the State failed to offer substantial evidence of an ongoing conspiracy, the out-of-court statements by Yak and Dominguez-Schiesl were inadmissible. But Bol does not claim that those statements were offered for the truth of the matter asserted—the ground guiding the court's ruling.[9] While Bol cites *Crowley* and *Frederiksen*, he misconstrues their import in the court's decision to admit the recorded interviews with Yak and Dominguez-Schiesl.

---

[9] We rejected an almost identical claim in Owo Bol's appeal when he "failed to address this basis for admission in his brief beyond a passing mention." *Bol*, 2023 WL 7391657, at *5–6.

The State contends that because Bol does not address "the *actual* basis" for the district court's ruling, "there is nothing to do but affirm" on this issue. We agree. "[T]he burden rests upon [Bol] to demonstrate error and this is not done if the record shows proper support for the ruling complained of." *Newmire v. Maxwell*, 161 N.W.2d 74, 80 (Iowa 1968). Because Bol does not argue on appeal that the co-defendants' statements to police fit the definition of hearsay under rule 5.801(c)(2), that basis for admission stands. *See Ruiz v. State*, 912 N.W.2d 435, 441 (Iowa 2018) (noting that waiver doctrine applies to issues not asserted on appeal).

## D.    Detective Shannon's Testimony on "Group" Crimes

Bol next argues that the district court erred in admitting Detective Shannon's testimony relating to gangs. The court allowed the detective to address his experience in investigating cases involving "multiple suspects." Shannon testified that sometimes when "activities occur with groups" then "you see strength in numbers." Bol claims on appeal that the court permitted "gang evidence under a different name."

Before addressing the merits, the State argues Bol did not preserve error on this claim. We agree. In a pretrial motion, Owo Bol moved to exclude testimony on "gang affiliation" even if the witness employs a "euphemism" such as "complex crimes." Bol did not join this motion. Nor did he raise the issue at trial. In his reply brief, Bol contends that his motion in limine "sought to exclude gang evidence." We see no instance of that in the record. He also argues that "the State may not force a joint trial against him and also assert error was not preserved due to co-defendants." But he cites no authority for that position.

An objection lodged by counsel for a co-defendant does not preserve error for a defendant who does not join that objection. *See Gavlock v. Coleman*, 493 N.W.2d 94, 98 (Iowa Ct. App. 1992); *State v. Fuller*, No. 00-1872, 2002 WL 100425, at *1 (Iowa Ct. App. Jan. 28, 2002). This record does not show that Bol had a blanket agreement to join motions made by his co-defendants. *See e.g.*, *State v. Voelkers*, 547 N.W.2d 625, 631 (Iowa Ct. App. 1996). Because Bol did not preserve error on his objection to Detective Shannon's testimony, we decline to reach the merits of his claim.

**E.    Juror Bias**

Lastly, Bol argues that the court abused its discretion in refusing to replace Juror 31 who became visibly upset during the State's presentation of evidence. When the State played the 911 call, defense counsel observed that she was "sobbing" and unable to "regain her composure even beyond hearing that evidence." Bol asked the court to replace her with an alternate, but the court refused. The court promised it would keep an eye on the situation. But the parties cited no further incidents of the juror's behavior.

Jurors who show bias may require disqualification. *Webster*, 865 N.W.2d at 237. If a biased juror participates in deliberations, the accused deserves a new trial. *Id.* Voir dire is usually the venue to "smoke out" potential juror bias. *Id.* Juror bias may be actual or implied. *Id.* at 236. Implied bias may arise from a troubling closeness of the juror-victim relationship. *Id.* "Actual juror bias occurs when the evidence shows that a juror, in fact, is unable to lay aside prejudices and judge a case fairly on the merits." *State v. Ingram*, No. 17-0584, 2018 WL 1870417, at *5 (Iowa Ct. App. Apr. 18, 2018) (citation omitted). And "a jury consisting of eleven

impartial jurors and one actually biased juror is constitutionally infirm without any showing that there was juror misconduct." *Webster*, 865 N.W.2d at 237 n.7.

Further, a juror's lack of candor during voir dire can raise a serious question of bias. *Id.* at 237. But Bol does not compare Juror 31's display of emotions with her voir dire responses. He instead argues her demeanor during the 911 call—coupled with the guilty verdicts—shows her bias. The district court disagreed. It found her oath not to make decisions based on emotion more compelling. We give this finding weight. *See id.* at 238. A juror expressing empathy for crime victims does not automatically merit disqualification for bias: "If we disqualified jurors because they empathized with the family of crime victims, we would have no jurors." *Id.* at 239. As we found in Owo Bol's appeal: "The juror's single display of emotion, which was not repeated, is not an example of juror bias. We find no abuse of discretion on this point." *Bol*, 2023 WL 7391657, at *7.

## IV. Conclusion

In sum, the district court did not abuse its discretion in deciding the verdict was not contrary to the weight of the evidence or in refusing to replace Juror 31. Nor did the court err in admitting statements by Bol's sister under the coconspirator exemption from the hearsay rule. We also affirm the court's ruling on the admissibility of the co-defendants' police interviews. Finally, Bol did not preserve error on his challenge to the testimony of Detective Shannon. Because none of his five claims provides a ground for relief, we affirm his convictions.

**AFFIRMED.**